The MEDICAL CENTER OF DE-
LAWARE, INC., Defendant
Below–Appellant,

v.

Lynne LOUGHEED and Robert
Lougheed, Plaintiffs Below–
Appellees.

No. 456, 1994.

Supreme Court of Delaware.

Submitted: May 9, 1995.
Decided: June 23, 1995.

**1056**

Joanne B. Wills (argued), and Eileen K. Anderson, Morris, James, Hitchens & Williams, Wilmington, for appellant.

Kenneth M. Roseman (argued), Ciconte, Roseman & Wasserman, Wilmington, for appellees.

Before VEASEY, C.J., WALSH and HARTNETT, JJ.

HARTNETT, Justice.

In this appeal, we review the decision of the Superior Court in which it denied a new trial and denied a motion for a remittitur of the damage awards rendered by the jury. The suit is a claim for damages arising out of an injury sustained by Lynne Lougheed ("Mrs. Lougheed") (Appellee and Plaintiff Below) while she was a patient at The Medical Center of Delaware ("the Medical Center") (Appellant and Defendant Below). In affirming, we hold that competent expert medical testimony was presented at trial showing that the Medical Center had violated the required standard of medical care, that an improper closing argument of the Lougheeds' attorney did not deny the Medical Center a fair trial, and that the Superior Court did not abuse its discretion in refusing to grant the motion for a remittitur of the damage awards.

*I. The Facts*

Early in 1990, Mrs. Lougheed was diagnosed as having non-Hodgkin's lymphoma and she received chemotherapy for six months. In conjunction with the chemotherapy, Mrs. Lougheed also received Prednisone, a corticosteroid drug that was administered to combat the joint pain that results from some forms of chemotherapy. One side effect of Prednisone is a condition known as avascular necrosis, a weakening of the bone tissue.

In early 1991, the lymphoma was in remission, the chemotherapy treatments had ended, and Mrs. Lougheed was becoming stronger each day. Although her physician was not yet ready to allow Mrs. Lougheed to return to work, she was allowed to resume a normal lifestyle. At that point, Mrs. Lougheed experienced no pain in any of her joints, her hips, neck, or shoulders.

Mrs. Lougheed's physician advised that she undergo a bone marrow harvest, an outpatient procedure through which some of Mrs. Lougheed's bone marrow would be harvested and stored for use in the event of a recurrence of the lymphoma. She was told that recovery from the procedure would take approximately one week, after which she could probably return to work.

In February 1991, Mrs. Lougheed was admitted to the Medical Center and the bone marrow harvest was performed under general anesthesia. Following the operation, she complained of terrible pain. Around 12:30 p.m., Mrs. Lougheed asked to use the bathroom. According to her recollection, she was still suffering pain that "was so bad that it was just making [her] sick all over."

She was helped from the bed to the bathroom by a nurse. While she was seated, she began to feel nauseous and lightheaded. She called for her husband to get someone to help her and Mr. Lougheed went into the hallway and requested assistance. Patricia Sammons, a licensed practical nurse, came into the bathroom and talked with Mrs. Lougheed to assess her condition. Without calling for additional assistance, Nurse Sammons helped Mrs. Lougheed to stand and began helping her back to her bed. Mrs. Lougheed lost consciousness and fell onto her right shoulder.

Within a few days of the fall, Mrs. Lougheed began experiencing pain in her right

shoulder. Tests revealed avascular necrosis and an impact fracture of the head of her right humerus bone. Following this diagnosis, Mrs. Lougheed underwent arthroscopy in an unsuccessful attempt to alleviate her pain.

Mr. and Mrs. Lougheed filed suit against the Medical Center. Mrs. Lougheed alleged that the negligence of the Medical Center employees caused her fall, her fracture, and the resulting pain. She asserted that the Medical Center nurse should have requested the assistance of a second nurse before attempting to assist Mrs. Lougheed back to bed. Mr. Lougheed asserted a loss of consortium claim. The Medical Center denied all allegations of negligence.

After trial, the jury rendered a verdict in favor of the Lougheeds and against the Medical Center, awarding $250,000 to Mrs. Lougheed and $25,000 to her husband.

The Medical Center moved for a new trial, or in the alternative, for a remittitur of the damage awards. The Superior Court denied both motions.

## II. The Legal Claims

The Medical Center, in its motion for a new trial, contended that the Lougheeds did not present competent medical expert testimony in support of their claims of medical malpractice and that the closing comments made by the Lougheeds' counsel were improper and constituted reversible error. The Medical Center alternatively sought a remittitur, contending that the jury verdict was excessive. The motion was denied by the Superior Court. *Lougheed v. Medical Center of Delaware*, Del.Super., C.A. No. 91C–05–141, 1994 WL 682455, Silverman, J. (Oct. 31, 1994). The Medical Center appeals that decision.

## III. The Establishment of a Prima Facie Case

The Medical Center argues that the Lougheeds failed to adduce expert witness testimony of medical malpractice and, therefore, did not establish a *prima facie* case. Expert medical testimony is indispensable to assert a claim of medical malpractice. 18 Del.C. § 6853 states, in pertinent part:

No liability shall be based upon asserted negligence unless expert medical testimony is presented as to the alleged deviation from the applicable standard of care in the specific circumstances of the case and as to the causation of the alleged personal injury

· · ·

At trial, David L. Axon, M.D., testified that Mrs. Lougheed's shoulder injury and the accompanying pain resulted from the fall that occurred while she was a patient at the Medical Center. Patrice Bachmann, a nurse, testified, as an expert witness, that Nurse Sammons, a Medical Center employee, deviated from the applicable standard of care by assisting Mrs. Lougheed in a manner that allowed her to fall. The Medical Center argues that this testimony failed to establish a *prima facie* case, because Nurse Bachmann should not have been permitted to testify as an expert witness.

In reviewing the Superior Court's ruling that Nurse Bachmann was qualified to testify as an expert witness, we review for abuse of discretion. *Baldwin v. Benge*, Del. Supr., 606 A.2d 64, 67 (1992).

## IV. Qualification of an Expert Medical Witness

The qualification of an expert medical witness is controlled by 18 Del.C. § 6854. That statute has two subsections. The first states the general rule that:

(a) No person shall be competent to give expert medical testimony as to applicable standards of skill and care unless such person is familiar with that degree of skill ordinarily employed in the community or locality where the alleged malpractice occurred, under similar circumstances, by members of the profession practiced by the health care provider; provided, however, that any such expert witness need not be licensed in the State.

Subsection (a) originally constituted the entire 18 Del.C. § 6854. It was enacted to remedy the problem of "wandering witnesses" and "itinerant medicine men." *Butler v. Alatur*, Del.Supr., 419 A.2d 938, 939 (1980).

In 1980, the statute was amended to add subsection (b), which states:

(b) Any physician who has been in the active practice of medicine or surgery for at least the past 5 years and who currently practices in the State or within a state contiguous to the State and within a radius of 75 miles of the Capitol of the State shall be presumed to be competent to give expert medical testimony as to applicable standards of skill and care, if it shall be established that the degree of skill and care required of the expert in the locality where the expert practices or teaches is of the same or equivalent standard as the skill and care employed in the community or locality where the alleged malpractice occurred.

Subsection (b), therefore, creates a presumption of competence for "[a]ny *physician*" who meets the specific criteria set forth in that subsection.

The language of 18 Del.C. § 6854(b), however, is clearly limited to the testimony of physicians. In determining the qualifications of putative medical experts who are not physicians, a court must apply 18 Del.C. § 6854(a) rather than (b). This Court has previously recognized the sharp distinction between these two subsections. *Baldwin*, 606 A.2d at 67. In reviewing Nurse Bachmann's competency to testify as an expert witness, we, therefore, apply 18 Del.C. § 6854(a).[1]

In determining the competency of a witness who is not a physician to testify as an expert, the issue, therefore, is the witness' familiarity "with that degree of skill ordinarily employed in the community or locality where the alleged malpractice occurred, under similar circumstances, by members of the profession practiced by the health care provider." 18 Del.C. § 6854(a).

██ "Familiar," as used in 18 Del.C. § 6854(a), "means having more than a fair knowledge of the skill ordinarily employed in the community in question." *Loftus v. Hayden*, Del.Supr., 391 A.2d 749, 752 (1978).

The expert witness "should establish that he 'knows' what degree of skill is ordinarily employed [in the community or locality] and that he is well acquainted or thoroughly conversant with it." *Id.* It is also not enough for the expert merely to state that he is familiar with the degree of skill ordinarily employed under usual circumstances in the community where the alleged malpractice occurred. When an "objection is made to his qualifications, [he] must present facts from which the Court can reasonably conclude that the witness has the foundation essential to the expertise which he claims." *Id.* at 753. *Loftus* sets forth a non-exclusive list of means by which a medical expert can demonstrate he has acquired the necessary familiarity with community or locality standards. They include, by way of example: "1) direct observation in Delaware; 2) study in Delaware ...; 3) care of Delaware patients referred by Delaware physicians; 4) teaching of students who have dispersed to Delaware; 5) *reading* of Delaware medical records, reports, journals, and the like; 6) consultations with Delaware physicians; and 7) attendance at meetings with Delaware doctors." *Id.*[2]

Furthermore, "[e]ach factor must be considered in light of the relative difficulty or novelty of the medical problem ..." *Id.*

## V. Nurse Bachmann's Qualifications as an Expert Witness

██ The Lougheeds clearly established a proper foundation for Nurse Bachmann to be qualified as an expert witness. At trial it was shown that Nurse Bachmann had familiarity with the practice of post-surgical nursing in Delaware generally and at the Medical Center. She testified that: 1) she had worked at the Medical Center while employed by a third-party and, while there, she worked with the nursing staff and had the opportunity to observe post-surgical practices; 2) she cared for patients who were Delaware residents; 3) she taught nursing students who ultimately practiced in Delaware; 4) she had read articles published by

---

1. The Medical Center's assertion that the Superior Court in some unreported cases has applied 18 Del.C. § 6854(b) to witnesses other than physicians is not persuasive.

2. The Court was considering the credentials of a physician, not a nurse.

or disseminated to Delaware practitioners; 5) she had previously reviewed Delaware medical and nursing records; 6) she had consulted with Delaware nurses concerning Delaware Standards of Nursing Practices; 7) she attended nursing seminars in Delaware; 8) she attended seminars at which Delaware nurses were also in attendance; and 9) she had previously been qualified as an expert witness in Delaware courts.

We agree with the Superior Court that the nursing problem presented by this particular case (assisting a patient who becomes dizzy in the bathroom) is not particularly novel.

The Superior Court held that Nurse Bachmann could testify as an expert on the issue of standard of care. The Medical Center disagrees with this ruling. It argues that "because Nurse Bachmann admitted that she was unfamiliar with Delaware standards, the Lougheeds were required to either establish that Delaware standards were the same as those in the locality where Nurse Bachmann practiced, or that nationwide standards existed, and those nationwide standards encompassed both Delaware and Nurse Bachmann's locality."

The Medical Center's argument is flawed for two reasons. First, its basic factual premise is erroneous. Nurse Bachmann testified during *voir dire* that she was familiar with Delaware standards of nursing care. We do not accept the Medical Center's assertion that Nurse Bachmann's numerous contacts with medical professionals and patients in Delaware were mere "opportunities" to gain familiarity with Delaware standards. The Superior Court found that Nurse Bachmann was familiar with post-surgical nursing care in Delaware and we find no abuse of discretion in that holding.

Second, the Medical Center's insistence that "bridging" testimony between comparing nationwide standards and Delaware standards should have been provided flows from its misapplication of 18 Del.C. § 6854(b). For a physician to be qualified as an expert witness under 18 Del.C. § 6854(b), it must be

shown "that the degree of skill and care required of the expert in the locality where the expert practices or teaches is of the same or equivalent standard as the skill and care employed in the community or locality where the alleged malpractice occurred."

As discussed previously, however, 18 Del.C. § 6854(b) is not applicable to the testimony of Nurse Bachmann because she is not a physician and, therefore, bridging testimony was unnecessary. Nurse Bachmann established her familiarity with nursing practices in Delaware generally and within the Medical Center. In addition, following the guidance of *Loftus*, the Superior Court correctly examined Nurse Bachmann's familiarity with Delaware nursing practices in light of the difficulty or novelty of the medical procedure involved.

This case involves the standard of care applicable to a nurse who assists a post-operative patient who becomes lightheaded in the bathroom. As Nurse Bachmann noted, this is a fundamental nursing skill that she teaches in her fundamentals of nursing course and is a skill that is universal. Even if it had been necessary to establish that Delaware standards were the same as those in the locality where Nurse Bachmann practiced, or that nationwide standards exist, that burden was met.[3]

We conclude, therefore, that the Superior Court did not abuse its discretion in holding that Nurse Bachmann was qualified to testify as a medical expert pursuant to 18 Del.C. § 6854. The Medical Center's argument that the Lougheeds failed to create a *prima facie* case for malpractice through expert medical testimony, as required by 18 Del.C. § 6853, is, therefore, without merit.

### VI. The Lougheeds' Counsel's Closing Remarks

■ The Medical Center also contends that statements made by Lougheeds' counsel in his closing argument were sufficiently improper as to render the trial unfair.

---

**3.** *See Butler,* 419 A.2d at 939, where this Court held that the plaintiff's expert witnesses, psychiatrists who practiced in both New Jersey and Pennsylvania, were qualified to offer expert testi-

mony. The Court noted that the case did not involve surgery or specific medical testing, but residential psychiatric care, which involved "no peculiar Delaware element." *Id.*

During closing argument Counsel asserted that Nurses Kaiser and Shields had testified that there had been a breach of the community standard of care by the personnel of the Medical Center. The trial judge had sustained objections to such testimony by the nurses because they had not been qualified as expert witnesses. There was, however, no objection from the Medical Center as to the summation comments.

█ In refusing to grant a new trial, the Superior Court held that the Medical Center's failure to object to the statements made during the summation constituted a waiver of the objection and that it was not clear that Lougheed's counsel had misstated the record. The granting of a motion for a new trial is in the discretion of the trial court and our standard of review is abuse of discretion. *Eustice v. Rupert*, Del.Supr., 460 A.2d 507 (1983).

A party must timely object to improper statements made during closing argument in order to give the trial court the opportunity to correct any error. We recognize that, for strategy reasons, counsel may choose not to object to a misstatement made in an opponent's closing remarks, but the failure to object generally constitutes waiver of the right subsequently to raise the issue. *Id.* See Laurence J. Smith, *Art of Advocacy: Summation,* § 2.23, Matthew Bender (1987). An exception arises, however, if plain error exists. *Mason v. State*, Del.Supr., 658 A.2d 994, 996, Veasey, C.J. (1995); "[W]here substantial rights are jeopardized and the fairness of the trial imperiled, this Court will apply a plain error standard of review." *Robertson v. State*, Del.Supr., 596 A.2d 1345, 1356 (1991) (quoting *Stansbury v. State*, Del. Supr., 591 A.2d 188, 191 (1991)); *Ray v. State*, Del.Supr., 587 A.2d 439 (1991); *Weber v. State*, Del.Supr., 547 A.2d 948, 960 (1988). In order for this Court to find plain error, "the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process." *Robertson,* 596 A.2d at 1356 (quoting *Wainwright v. State,* Del.Supr., 504 A.2d 1096, 1100, *cert. denied,* 479 U.S. 869, 107 S.Ct. 236, 93 L.Ed.2d 161 (1986) (internal citations omitted)).

Although Lougheed's counsel should not have referred to inadmissible expert opinion evidence during his closing argument, the reference was not so clearly prejudicial to the Medical Center's substantial rights as to jeopardize the fairness and integrity of the trial. We note, as did the Superior Court, that "the issue of standard of care was a focal point of the trial and the jury presumably took counsel's closing argument as nothing more than that—argument." *Lougheed,* slip op. at 9. In addition, the evidence in question was merely cumulative of Nurse Bachmann's expert testimony. Therefore, we find that the disputed remarks at closing argument did not rise to the level of plain error.

### VII. The Jury Award Was Not Excessive

█ The jury awarded Mrs. Lougheed $250,000 in damages, and awarded Mr. Lougheed $25,000 for his loss of consortium claim. The Medical Center moved for a remittitur, which the Superior Court denied.

The Medical Center contends that the awards should have been reduced for three reasons. First, it claims that the nature of Mrs. Lougheed's injuries made it impossible to apportion damages accurately between the injuries arising from her fall at the Medical Center, and those resulting from avascular necrosis, a pre-existing injury caused by chemotherapy. Second, the Medical Center argues that the Lougheeds did not provide evidence as to the degree of permanency of Mrs. Lougheed's injuries. Finally, the Medical Center contends that Mrs. Lougheed's claim to lost wages was speculative.

At trial, in support of the claim for damages, the Lougheeds presented evidence that the injury to the head of Mrs. Lougheed's right humeral bone was caused by direct impact, and not from avascular necrosis. The jury also heard testimony as to Mrs. Lougheed's substantial pain and physical limitation, as well as her constant need for medication and the withdrawal symptoms that she experienced when she unsuccessfully attempted to discontinue use of the pain medication. Testimony was also introduced that Mrs. Lougheed had undergone surgery in an unsuccessful attempt to stop the con-

stant pain and Mrs. Lougheed testified to the terrible depression that she had experienced from the pain and withdrawal symptoms. The jury was told that Mrs. Lougheed had remained in constant pain for over three years and that she had a life expectancy of 48.3 years. Therefore, the jury had before it evidence from which it could understand the extent and permanence of Mrs. Lougheed's injuries, as well as the degree to which the injuries were attributable to her fall at the Medical Center.

■ The Superior Court correctly stated the standard that should be applied when a jury award is challenged as being excessive:

> A verdict will not be disturbed as excessive unless it is so clearly so as to indicate that it was the result of passion, prejudice, partiality, or corruption; or that it was manifestly the result of disregard of the evidence or applicable rules of law. A verdict should not be set aside unless it is so grossly excessive as to shock the Court's conscience and sense of justice; and unless the injustice of allowing the verdict to stand is clear.

*Riegel v. Aastad,* Del.Supr., 272 A.2d 715, 717–18 (1970) (collecting cases). "Recognizing that it would be remiss in its duties to invade an area within the exclusive province of the jury, the courts will yield to the verdict of the jury where any margin for reasonable difference of opinion exists in the matter of a verdict." *Storey v. Castner,* Del.Supr., 314 A.2d 187, 193 (1973) (citing *Burns v. Delaware Coca–Cola Bottling Co.,* Del.Super., 224 A.2d 255, 259 (1966)). *See also Lacey v. Beck,* Del.Super., 161 A.2d 579 (1960) (every jury's verdict is presumed correct and just). If a jury verdict is supported by the evidence, it must be upheld. *Gannett Co. v. Re,* Del.Supr., 496 A.2d 553 (1985).

■ An appeal from a trial court's denial of a motion to remit a jury verdict is governed by the abuse of discretion standard of review. *Strauss v. Biggs,* Del.Supr., 525 A.2d 992, 996–97 (1987).

We find that the Superior Court did not abuse its discretion in refusing to grant a remittitur.

*VIII. Conclusion*

For the foregoing reasons, the judgment of the Superior Court is hereby AFFIRMED.