IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NORTH AMERICAN LEASING, INC., a Michigan corporation, DORE & ASSOCIATES CONTRACTING, INC., an Indiana corporation, NASDI, LLC, a Delaware limited liability Company, and YANKEE ENVIRONMENTAL SERVICES, LLC, a Delaware limited liability Company, | § § § § § § § § § § | No. 192, 2020<br><br>Court Below:  Court of Chancery of the State of Delaware<br><br>C.A. No. 2017-0399 |
| Defendants Below, Appellants, | § § § | |
| v. | § § | |
| NASDI HOLDINGS, LLC, a Delaware limited liability company, and GREAT LAKES DREDGE AND DOCK CORPORATION, a Delaware Corporation, | § § § § § § § | |
| Plaintiffs Below, Appellees. | § § § | |

Submitted: January 12, 2022
Decided:  April 11, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en banc*.

Upon appeal from the Court of Chancery.  **AFFIRMED.**

Joseph B. Cicero, Esquire, Paul D. Brown, Esquire, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; Mark L. McAlpine, Esquire, Douglas W. Eyre, Esquire (*argued*), MCALPINE PC, Auburn Hills, Michigan, for Appellants, North American Leasing, Inc., Dore & Associates Contracting, Inc., NASDI, LLC, and Yankee Environmental Services, LLC.

Brian C. Ralston, Esquire, Mathew A. Golden, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Michael Dockterman, Esquire (*argued*), STEPTOE & JOHNSON, LLP, Chicago, Illinois, for Appellees, NASDI Holdings, LLC and Great Lakes Dredge and Dock Corporation

**VAUGHN**, Justice, for the Majority:

2

The disputes in this case arise from an Ownership Interest Purchase Agreement dated April 23, 2014 (the "Agreement"). Pursuant to the Agreement, Appellant North American Leasing, Inc. ("North American Leasing"), a Michigan corporation, purchased Appellant NASDI, LLC ("NASDI"), a Delaware limited liability company, and Appellant Yankee Environmental Services, LLC ("Yankee"), also a Delaware limited liability company. NASDI is in the business of providing demolition and site redevelopment services throughout the United States. The seller was Appellee NASDI Holdings, LLC ("NASDI Holdings"), a Delaware limited liability company, which before the sale, possessed all ownership interests in NASDI and Yankee.

In Section 7.7 of the Agreement, Great Lakes Dredge and Dock Corporation ("Great Lakes"), a Delaware corporation and the parent company of NASDI Holdings, agreed that performance and payment bonds on existing projects being performed by NASDI and Yankee at the time of the sale would remain in place for the duration of each project. The Agreement also provided that North American Leasing, NASDI, Yankee, and Appellant Dore & Associates Contracting, Inc. ("Dore"), an Indiana company affiliated with North American Leasing, would indemnify NASDI Holdings and its affiliates for any losses arising from those bonds that Great Lakes agreed would remain in place on existing projects. North American Leasing, NASDI, Yankee, and Dore will sometimes be collectively referred to as the

3

Defendants. NASDI Holdings and Great Lakes will sometimes be referred to as the Plaintiffs.

After the sale of NASDI and Yankee was completed, Great Lakes incurred losses from performance and payment bonds on a project known as the Bayonne Bridge project. The Bayonne Bridge project was one of the existing projects being performed by NASDI when NASDI was sold to North American Leasing. The losses occurred in 2017 after NASDI notified the general contractor for the project that NASDI would not be performing any further services. When that occurred, NASDI Holdings and Great Lakes gave North American Leasing notices of claims for indemnification for any losses resulting from the project's performance and payment bonds. The Defendants have taken the position throughout this litigation that they have no obligation to indemnify the Plaintiffs because the Plaintiffs' claims notices were untimely under the Agreement. The Court of Chancery rejected the Defendants' contention and entered judgment against the Defendants for the total amount of the Plaintiffs' claim.

The Defendants make three arguments on appeal. First, they contend that the Court of Chancery erred by failing to interpret the Agreement according to principles of Delaware contract law. This contention centers on their argument that the Plaintiffs did not give timely notices of the indemnification claims. Second, they contend that the Court of Chancery erred by finding that they waived an affirmative

4

defense of set-off and/or recoupment. Their third claim is that the Court of Chancery erred by granting the Plaintiffs the full amount of their indemnification claims, without considering evidence that the total amount should have been reduced. For the reasons that follow, we reject the Defendants' claims and affirm the decision of the Court of Chancery.

## I. FACTS AND PROCEDURAL HISTORY

The Bayonne Bridge project was a subcontract with Skanska Koch Kiewit Infrastructure Co. ("Skanska") to perform certain demolition work in connection with Skanska's prime contract with the Port Authority of New York and New Jersey. The project included replacement of the main span roadway and approach structures of the Bayonne Bridge. The total price of NASDI's subcontract was $20,359,375. The subcontract required NASDI to furnish performance and payment bonds in an amount equal to the subcontract price. NASDI provided separate performance and payment bonds, each in the amount of $20,359,375, dated August 6, 2013. The bonds were secured by an Agreement of Indemnity and an Equipment Utilization Agreement executed by Great Lakes, NASDI Holdings, NASDI, and Yankee in favor of Zurich American Insurance Company ("Zurich").

Several provisions of the Agreement for the sale of NASDI and Yankee are relevant to this appeal. Great Lakes' agreement that performance and payment bonds on existing projects would remain in place for the duration of each project is

set forth in Section 7.7(a) of the Agreement. In that section, Great Lakes agreed "that each of the Performance/Payment Bonds set forth on Schedule 1.1(a) shall remain in place until such time as such bond is no longer required under the contract with respect to which such bond was put in place (as such contract is now in effect)."[1] Great Lakes' obligation under Section 7.7(a) was continuing until such time as no bonds guaranteed by Great Lakes remained, a day referred to in the Agreement as the "Bond Covenant Termination Date."[2] The bonds for the Bayonne Bridge project were included on Schedule 1.1(a) to the Agreement so that, in connection with the sale of NASDI, Great Lakes became obligated to maintain the bonds until they were no longer required under the Bayonne Bridge subcontract.

The sale of NASDI required a new contractual arrangement concerning the bonds procured for the Bayonne Bridge project. Zurich consented to release Great Lakes, NASDI Holdings, NASDI, and Yankee from their obligations under the prior agreement and agreed to secure the bonds in exchange for new agreements. One was a Guarantee and Indemnity Agreement dated April 23, 2014, which obligated Great Lakes to indemnify and hold Zurich harmless for any loss or liability arising from the bonds. In another, Great Lakes executed a $20 million—later increased to $30 million—letter of credit in favor of Zurich (the "Letter of Credit").

---

[1] App. to Opening Br. at A291.
[2] *Id.*

Section 9.2 of the Agreement obligated the Defendants to indemnify the Plaintiffs against seven potential losses. Section 9.2(a) provided for indemnification for losses resulting from the breach of a representation, warranty, or covenant. Section 9.2(e) obligated the Defendants to indemnify the Plaintiffs for any losses arising from the performance and payment bonds that Great Lakes was required to maintain on existing projects under Section 7.7(a), including the Bayonne Bridge project.

On February 13, 2017, as it was scheduled to begin work on Stage 4 of the Bayonne Bridge project, NASDI gave Skanska a Notice of Termination of the Bayonne Bridge subcontract, stating NASDI's intention to demobilize from the site immediately. On February 14, 2017, NASDI Holdings and Great Lakes gave notice to North American Leasing, pursuant to Section 9.3(a) of the Agreement, that NASDI's failure to perform under the Bayonne Bridge subcontract may result in loses for which the Defendants would be obligated to indemnify the Plaintiffs pursuant to Section 9.2(e).

On February 23, 2017, Skanska declared NASDI in default and terminated the subcontract. On the same date, Skanska notified Zurich of NASDI's alleged default and made a demand on Zurich for performance under the performance bond.

On February 24, 2017, Zurich notified Great Lakes that it would look to Great Lakes pursuant to the Guaranty and Indemnity Agreement, the Letter of Credit

7

Agreement, and the Letter of Credit, for indemnity relating to all loss, cost, or expense that Zurich had incurred or may incur by reason of the bonds.

On March 2, 2017, Siefert Associates LLC ("Siefert"), a subcontractor of NASDI's on the Bayonne Bridge project, filed a proof of claim under the payment bond, alleging that NASDI failed to pay $328,554 for labor and materials. On April 5, 2017, NASDI Holding and Great Lakes gave notice to North American Leasing that the Siefert claim could result in losses for which the Defendants would be obligated to indemnify the Plaintiffs pursuant to Section 9.2(e) of the Purchase Agreement.

On May 11, 2017, Zurich began drawing down on the Letter of Credit. By May 22, 2017, Zurich had completed that process, drawing a total of $20,881,824, plus $52,204.56 for bank fees (the "2017 Losses").

The Plaintiffs filed a Verified Complaint in the Court of Chancery on May 26, 2017, seeking indemnification from the Defendants for the full amount of the 2017 Losses. The Verified Complaint set forth three causes of action: 1) breach of contract, alleging that the Defendants breached their indemnity obligation under Section 9.2(e); 2) equitable subrogation; and 3) a claim for a declaratory judgment that the Defendants had breached their indemnity obligation under Section 9.2(e). The Defendants' Answer denied the allegations of the complaint and asserted five affirmative defenses: contractual limitations, asserting that the Plaintiffs' action was

8

barred because the notices of a claim for indemnification given by the Plaintiffs to North American Leasing on February 14, 2017, and April 5, 2017, were untimely under Section 9.3(a) of the Agreement; failure to state a claim for which the relief of equitable subrogation could be granted; unclean hands; failure to mitigate; and set-off/recoupment.

The Plaintiffs filed a Motion for Partial Summary Judgment on their breach of contract and declaratory judgment claims. With respect to the breach of contract claim, the motion asked the court to enter judgment in the amount of $20,934,028— the amount drawn down by Zurich on the Letter of Credit. The motion also sought an adjudication that the Defendants' first four affirmative defenses were not sufficient to defeat summary judgment. None of the briefs filed in connection with the Motion for Partial Summary Judgment made any mention of the Defendants' fifth affirmative defense, set-off/recoupment.

In an opinion dated April 8, 2019, the Court of Chancery granted the Plaintiffs' motion for summary judgment on their breach of contract claim and the affirmative defenses of unclean hands and failure to mitigate. The Defendants filed a Motion for Reargument in which they made no mention of the set-off/recoupment affirmative defense. The Court of Chancery denied the Motion for Reargument. The Plaintiffs then moved for entry of final judgment. In its answering brief on that motion, the Defendants argued that their affirmative defense of set-off/recoupment

9

had not been adjudicated and that adjudication of that defense should result in a reduction of the Plaintiffs' damages. In an order resolving the issues raised by the Motion for Entry of Final Judgment, the court found that the Defendants waived the set-off/recoupment affirmative defense by not raising it in response to the Motion for Partial Summary Judgment or in their Motion for Reargument.

## III. DISCUSSION

### A. Breach of Contract

This Court reviews "questions of contract interpretation *de novo*."[3] Delaware law "adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party."[4] "When interpreting a contract, this Court 'will give priority to the parties' intentions as reflected in the four corners of the agreement,' construing the agreement as a whole and giving effect to all its provisions."[5] Furthermore, "a court must determine the intent of the parties from the language of the contract."[6]

The Defendants' first claim is that the Court of Chancery misinterpreted the Agreement by rejecting their contention that the Plaintiffs' notices to North

---

[3] *Salamone v. Gorman*, 106 A.3d 354, 367 (Del. 2014).
[4] *Id.* at 367-68.
[5] *Id.* at 368.
[6] *Id.*

10

American Leasing dated February 14, 2017, and April 5, 2017, asserting their indemnification rights were untimely under the terms of the Agreement.

The giving of notice of a claim for indemnification is governed by Section 9.3(a) of the Agreement. It requires that an indemnitee give notice of a claim for indemnification to the indemnitor:

> within a reasonable time after such Indemnitee becomes aware of the existence of any potential Claim by such Indemnitee for Indemnification under this ARTICLE 9, but in any event before the later of the Termination Date or the survival period provided in Section 9.5 with respect to particular representation or warranty to which the matter applies (the "Applicable Claim Period"), arising out of or resulting from: (a) any item indemnified pursuant to the terms of Section 9.1 or 9.2 . . . .[7]

The "Termination Date" is defined in the Agreement as March 31, 2016.[8]

"Termination Date" appears in two other sections of the Agreement. One is Section 9.5, which deals with "Survival of Representations and Warranties." That section provides that "[a]ll representations and warranties of Parent, Seller and the Companies contained in this Agreement, as qualified by the Disclosure Schedules hereto shall remain operative and in full force and effect until the Termination Date; provided, that"[9] certain representations and warranties "shall survive for the full period of the applicable statutes of limitations plus 60 days."[10] The "Parent" under

---

[7] App. to Opening Br. at A297.
[8] *Id.* at A261.
[9] *Id.* at A298.
[10] *Id.* at A299.

the Agreement is Great Lakes.[11]  The "Seller" is NASDI Holdings.[12]  The "Companies" are NASDI and Yankee.[13]  Thus, the representations and warranties referred to in Section 9.5 are binding on the entities who entered the transaction from the seller's side, not North American Leasing or its affiliates.  This section is easily understood as providing a date, March 31, 2016, on which the seller's representations and warranties would come to an end, except for certain representations and warranties that would survive for the full period of the statute of limitations plus 60 days.

The other section in which the phrase "Termination Date" appears is Section 9.1(c).  This section deals generally with "Indemnification of Purchaser."  Section 9.1(c) provides that NASDI and Yankee, the "Companies," i.e., the companies being sold, "shall maintain in effect, until the Termination Date, or such longer time as there remains a contested claim of Company Breaches, insurance coverage in amounts not less than as maintained by the Companies . . . as of the date of this Agreement."[14]  A "Company Breach" is defined in Section 9.1(a)(i) as "a breach of or default in any of the representations or warranties given by the Parent, a Company or Seller in this Agreement."[15]  The phrase, "Termination Date," therefore, as used

---

[11] *Id.* at A250.
[12] *Id.*
[13] *Id.*
[14] *Id.* at A297.
[15] *Id.* at A295.

in Sections 9.5 and Section 9.1(c), applies only to the seller's representations and warranties.

The Defendants contend that the clause in Section 9.3(a) that begins, "but in any event," cuts off the running of "a reasonable time" for giving notice of an indemnification claim and applies to all claims for indemnity regardless of the subject matter of the claim. Under their view, notice must be given for all indemnification claims of any kind before the Termination Date, except for those claims that are subject to a later survival period under Article 9.5. Under this theory, the Plaintiffs' claims for indemnification for losses from the Bayonne Bridge project bonds were barred after the March 31, 2016 Termination Date, even though the claims did not come into existence until 2017.

The Plaintiffs contend that Section 9.3(a) required them to give the notices of their indemnification claims within a reasonable time after they became aware that NASDI had demobilized from the Bayonne Bridge project and that Seifert had asserted a claim as an unpaid subcontractor. The clause beginning "but in any event," they contend, applies only to claims involving representations and warranties that are subject to the Termination Date or a survival period as described in Section 9.5.

The question, therefore, is whether the clause in Section 9.3(a) beginning "but in any event" is a limitation on the preceding "reasonable time" clause, or whether

it is an exception to that clause applicable only to indemnification claims arising from the seller's representations and warranties as discussed in Section 9.5.

In rejecting the Defendants' contention, the Court of Chancery reasoned as follows:

> The Indemnifying Defendants' interpretation is flawed. By zeroing in on the words "in any event," the Indemnifying Defendants lose sight of the purpose of the indemnification provisions as a whole. That purpose was to indemnify Plaintiffs for seven types of "Losses" set forth in Section 9.2. The fifth type of loss, set forth in Section 9.2(e), is one "arising out of relating to or incurred in connection with" the Bonds or Letter of Credit. Plaintiffs' bonding obligations under Section 7.7 remain operative until the "Bond Covenant Termination Date," or the date when the sureties are no longer required by the underlying projects. By interpreting the second clause as terminating Plaintiffs' indemnification rights relating to the Letter of Credit before Plaintiffs' obligation to maintain the Letter of Credit ceases, Defendants undermine the purpose of the indemnification provisions.[16]

We agree with the Court of Chancery. The only reasonable and convincing interpretation of Section 9.3(a) is the one advocated by the Plaintiffs. Section 9.3(a) provides that the reasonable time within which notice of a claim must be given does not begin to run until the indemnitee becomes aware of the existence of the claim, that is, sometime after the claim comes into existence. The clause beginning "but in any event" creates an exception for indemnity claims arising from the seller's

---

[16] Opening Br. Ex. A at 12-13.

representations and warranties, discussed in Section 9.5.[17] The clause requires that notice of a claim arising from a breach of the seller's representations and warranties must be given before the later of the Termination Date or a survival period provided for in Section 9.5, depending upon which of the two applies to the particular matter of the warranty or representation. The Defendants argue that the phrase "Applicable Claim Period," which appears at the end of the "but in any event clause" and in the final sentence of Section 9.3, applies to all claims for indemnification. We construe "Applicable Claim Period," however, as denoting a reasonable time after an indemnitee becomes aware of a claim, for most types of Article 9 claims, including the ones asserted by the Plaintiffs in this case, or the Termination Date or the end of a survival period for claims arising from alleged breaches of representations and warranties discussed in Section 9.5.

This interpretation is the one most consistent with the Agreement's other relevant provisions. The survival periods have no relevance to the Plaintiffs' claims at all. Nothing in the Agreement provides any explanation as to why the parties would intend to cut-off claims for indemnification arising from performance and payment bonds before the Bond Covenant Termination Date, or even before the

---

[17] Focusing on the phrase "in any event," our colleagues in the dissent assert that this idiom introduces a limitation, not an exception. While such rules of construction may be helpful in some cases, we also think that this phrase must be read in the context of the provision and the contract as a whole. For the reasons discussed herein, we believe "but in any event" introduces an exception.

claims come into existence. We reject the Defendants' contention that the Plaintiffs' claims are barred because notice was not given until after the Section 9.5 Termination Date.[18]

## B. Waiver of the Set-off/Recoupment Defense

The Defendants argue next that the Court of Chancery erred when it found that they waived their affirmative defense of set-off/recoupment. This Court reviews a trial court's finding of waiver under the standard of plain error.[19] "In order for this Court to find plain error, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[20]

In an order resolving the issues raised by the Plaintiffs' Motion for Entry of Final Judgment, the Court of Chancery held that the Defendants had waived their affirmative defense of set-off/recoupment. The Defendants contend that they were not required to litigate that affirmative defense in response to the Plaintiffs' Motion for Partial Summary Judgment. A party filing a motion for partial summary judgment may leave issues to be decided at trial that are outside the scope of the motion.[21] The Defendants argue that the Plaintiffs never challenged the Defendants'

---

[18] The Defendants also argue that Section 9.7, which discusses exclusive remedies and subrogation rights, supports their argument. We disagree. Section 9.7 merely sets forth and preserves remedies that may be available to the contracting parties in addition to their contractual rights to indemnification. Nothing in Section 9.7 suggests that subrogation was to be the Plaintiffs' sole remedy for a claim based on a surety bond after the Termination Date.
[19] *Med. Ctr. Of Del., Inc. v. Lougheed,* 661 A.2d 1055, 1060 (Del. 1995).
[20] *Id.*
[21] Del. Ct. Ch. R. 56.

set-off/recoupment defense in their Motion for Partial Summary Judgment and sought only the trial court's ruling as to liability, not damages. Because, they contend, set-off/recoupment is a defense that pertains to damages, and damages were not within the scope of the motion for partial summary judgment, they were not required to brief the court on this issue and therefore did not waive this defense.

The Plaintiff's Motion for Partial Summary Judgment, however, expressly sought judgment on their breach of contract claim "in the amount of $20,934,028.56,"[22] a specific amount substantiated by a letter from Zurich. By moving for judgment for the specific amount of their entire claim, it is evident the Plaintiffs sought summary judgment on all issues relating to the breach of contract claim, including affirmative defenses. The Defendants were on notice that they should raise any issue, including any affirmative defense, that might reduce the amount of damages the Plaintiffs sought in the motion. The Defendants' failure to raise the set-off/recoupment defense in their briefs is compounded by the fact that they also did not raise the defense in their Motion for Reargument. There is no plain error.

## C. Damages

Lastly, the Defendants argue that the Court of Chancery erred in granting the Plaintiffs the full amount of their indemnification claim without considering

---

[22] App. to Opening Br. at A446.

evidence that the amount should be reduced. The Defendants argue that because the Court of Chancery erred in its decision that the Defendants waived their set-off/recoupment defense, they were unable to set forth evidence in opposition to the Plaintiffs' damages calculation. However, because we have found that the Court of Chancery did not err when it found that the Defendants waived their set-off/recoupment defense, the court did not err when it did not consider the Defendants' evidence regarding reduction of damages.

### III. CONCLUSION

For the foregoing reasons, the judgment of the Chancery Court is affirmed.

**TRAYNOR**, Justice, dissenting, joined by **SEITZ**, Chief Justice:

Because the majority's interpretation of the Ownership Interest Purchase Agreement does not adequately account for the ordinary meaning of Section 9.3, we respectfully dissent.

I

Delaware adheres to an objective theory of contracts, meaning that a "contract's construction should be that which would be understood by an objective, reasonable third party."[23] Under this approach, our contractual analysis begins—and often ends—with the plain terms of the contested provision, and "we 'interpret clear and unambiguous terms according to their ordinary meaning.'"[24] Thus, "[i]f a contract's meaning is plain and unambiguous, it will be given effect" without consideration of extrinsic evidence.[25] On the other hand, "when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings[,]" the provisions are ambiguous and extrinsic evidence may be considered.[26]

---

[23] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

[24] *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019) (quoting *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012)); *see Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, --- A.3d ----, 2022 WL 619700, at *5 (Del. Mar. 3, 2022).

[25] *Borealis Power Holdings Inc. v. Hunt Strategic Utility Inv., L.L.C.*, 233 A.3d 1, 9 (Del. 2020); *Exelon Generation Acq., LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017).

[26] *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) (citing *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982)); *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 56–57 (Del. 2019) ("When a contract's plain meaning, in the context of the overall structure of the contract, is susceptible to

For simplicity, this dissent refers to the appellants and defendants below as "North American Leasing" or the "Defendants." The Defendants were the buyers in the transaction involved in this case. We refer to the appellees and plaintiffs below as "NASDI Holdings" or the "Plaintiffs." The Plaintiffs were the sellers in the transaction and enjoyed the contractual indemnification right that is at issue.[27]

These parties carefully addressed remedies in Article 9 of the Ownership Interest Purchase Agreement (the "Agreement"). Although they specified that "the Indemnification rights set forth in this ARTICLE 9 are and shall be the sole and exclusive remedies of the Parties to this Agreement," they agreed to preserve claims for common-law fraud and equitable subrogation related to certain bonding obligations.[28] Additionally, the parties limited the available indemnification rights through Section 9.3, which requires that an indemnitee give notice of a claim

> within a reasonable time after such Indemnitee becomes aware of the existence of any potential Claim by such Indemnitee for Indemnification under this ARTICLE 9, ***but in any event before the later of the Termination Date or the survival period provided in Section 9.5 with respect to [the] particular representation or warranty to which the matter applies*** (the "Applicable Claim Period"),

---

more than one reasonable interpretation, courts may consider extrinsic evidence to resolve the ambiguity." (internal quotation marks and citation omitted)).

[27] App. to Opening Br. at A297. The Defendants also had indemnification rights, but they are not at issue. *See id.* at A295.

[28] *Id.* at A299.

> arising out of or resulting from: (a) any item indemnified pursuant to the terms of Section 9.1 or 9.2 . . . .[29]

The "Termination Date" is defined in the Agreement as March 31, 2016.[30]

Our colleagues in the majority conclude that "[t]he clause [in Section 9.3] beginning 'but in any event' creates an exception for indemnity claims arising from the seller's representations and warranties discussed in Section 9.5."[31] The majority reasons that this reading represents "[t]he only reasonable and convincing interpretation of Section 9.3(a)"[32] and the one "most consistent with the Agreement's other relevant provisions."[33] The majority does not, however, explain how its interpretation can be derived from Section 9.3's text, the appropriate starting point for the interpretation of a contractual provision.[34] And here, our reading of the relevant text leads us to the opposite conclusion.

All agree that the proper interpretation of Section 9.3 as it relates to the Plaintiffs' indemnification claim turns on the meaning ascribed to the phrase "in any event." The question presented is: does this create a qualification applicable to all indemnification claims (unless specifically excepted) or does it signal an exception

---

[29] *Id.* at A297 (emphasis added).

[30] *Id.* at A261. The majority observes that "Termination Date" appears in two sections of the Agreement that address representations and warranties. This does not change the fact that the term is defined without limitation to mean "March 31, 2016." *Id.*

[31] Maj. Op. at 14–15.

[32] *Id.*

[33] *Id*. at 15.

[34] *See, e.g.*, *Exelon*, 176 A.3d at 1267 ("Our objective is to determine the intent of the parties from the language of the contract.").

21

applicable only to representation-and-warranty claims?  The Court of Chancery appears to have acknowledged that contractual drafters typically use the phrase "in any event" to introduce a limiting or qualifying clause.[35]  Yet the court, based almost exclusively on what is found elsewhere in the Agreement, determined that "in any event" creates an exception here.[36]  The majority agrees.

We, on the other hand, believe that the phrase "in any event," standing on its own, establishes a qualification applicable to all indemnification claims.  Our analysis begins with the phrase's commonly understood meaning.  We read "in any event" to mean "no matter what happens"[37] or "whatever the case may be."[38]

---

[35] *NASDI Holdings, LLC v. North American Leasing LLC,* 2019 WL 1515153, at *5 (Del. Ch. Apr. 8, 2019) (citing Kenneth A. Adams, *A Manual of Style of Contract Drafting*, §§ 13.541–46 (Am. Bar. Ass'n 3d ed. 2013)).

[36] *NASDI Holdings*, 2019 WL 1515153, at *5.  To be sure, the Court of Chancery also noted that "[i]n contractual drafting, 'but' typically introduces an exception."  *NASDI Holdings*, 2019 WL 1515153, at *6.  Yet even if "but" can be read to signal an exception here, that exception would operate "in any event."  Thus, our primary difference with the Court of Chancery relates to its conclusion that "but" begins an exception that is limited to "the particular representation or warranty to which the matter applies[.]"  *Id.* at *5 ("That exception applies to indemnification claims based on representations and warranties.").  In our view, this reading does not account for the entire text of the operative clause.  Nor does it allow for the use of "but" as a conjunction introducing a statement contrary to, or expanding on, the statement that precedes it, *e.g.*, "A must wash the dishes, but he must also sweep the floor," or, "A must wash the dishes tonight, but if B is coming over, he must wash them this afternoon."  In the Agreement at issue here, "but" in Section 9.3 operates expansively: notices of claim are due within a reasonable time, *but* they also must be submitted before the later of the Termination Date or, if applicable, the Survival Period established in Section 9.5.

[37] *In any case, at all events, in any event,* The American Heritage Dictionary of Idioms: American English Idiomatic Expressions & Phrases 223 (2d ed. 2013) ("**in any case**.  Also, **at all events**; **in any event**.  No matter what happens; certainly; also, whatever the fact is, anyway." (emphasis in original)).

[38] *Id.* at 17 ("**at any rate,** in any event, whatever the case may be; also, at least" (emphasis in original)).

Considered as such, Section 9.3's operative language is clear: notice of all indemnification claims must be given within a reasonable time after the indemnitee becomes aware of an indemnifiable claim, regardless of when that might occur. And no matter when that happens—or, "in any event"—notice of all indemnification claims, other than certain representation-and-warranty claims, must be given before the Termination Date of March 31, 2016.

Not only is this reading consistent with the commonly accepted understanding of the phrase "in any event," it is also consistent with the words composing the phrase. The drafters could have used the word "the" to establish a specific exception to the operation of the Termination Date, but instead they selected the adjective "any" to modify "event," indicating that the clause "in any event" applies to a set of events that is expansive—that is, "without distinction or limitation."[39] In our view, the Court of Chancery and the majority have paid insufficient heed to this word choice, prompting an unnecessary departure from the accepted meaning of this arguably decisive phrase

Finally, we note that Section 9.3 establishes "Applicable Claim Period" as a defined term meaning "the later of the Termination Date or the survival period provided in Section 9.5 with respect to [the] particular representation or warranty to

---

[39] *Any,* Oxford English Dictionary (3d ed. 2016, updated Mar. 2022) ("any" when used with a singular noun in affirmative contexts "refer[s] to a member of a particular group or class without distinction or limitation[.]").

which the matter applies[.]"[40]  Importantly, the term "Applicable Claim Period" is used later in Section 9.3 in the context of notice required for *all* indemnification claims, not just representation-and-warranty claims.[41]  This, in our view, casts further doubt on the majority's interpretation.

III

Having first ascertained the ordinary meaning of the words used in Section 9.3, we turn next to the Plaintiffs' contention—accepted by the Court of Chancery and the majority—that, when Section 9.3 is read together with Sections 7.7, 9.2 and 9.5, it becomes clear that the parties intended to establish a time for noticing claims coextensive with the survival periods applicable to the parties' representations and warranties.  We agree that contracts should be read as a whole, but, in our view, these provisions can be reconciled with more faithful adherence to the plain text of Section 9.3 than what the majority's construction achieves.[42]

Under Section 9.2(e), the Defendants must indemnify the Plaintiffs for losses

---

[40] App. to Opening Br. at A297.

[41] The final sentence of Section 9.3 provides that "[s]o long as such Notice of Claim is given on or prior to the **Applicable Claim Period**, no delay on the part of an Indemnitee in giving the Indemnitor a Notice of Claim shall limit or reduce the Indemnitee's right to Indemnity hereunder, nor relieve the Indemnitor from any of its obligations under this ARTICLE 9, unless (and then only to the extent that) the Indemnitor is prejudiced thereby; provided, however, that a Notice of Claim must be delivered with regard to any Company Breach no later than the date of termination of the **Applicable Claim Period** and, if raised by such date, such claim shall survive such survival period until final resolution thereof."  *Id.* at A298 (emphasis added).

[42] *See Council of Dorset Condo. Apartments v. Gordon*, 801 A.2d 1, 7 (Del. 2002) ("A court must interpret contractual provisions in a way that gives effect to every term of the instrument, and that, if possible, reconciles all of the provisions of the instrument when read as a whole.").

"arising out of, relating to or incurred in connection with" the bonds or letter of credit. And, according to Section 7.7, the relevant bonding obligations remain in effect until a Bond Covenant Termination Date, a date that had not yet been reached as of the Plaintiffs' notice of claim. Thus, as the majority accurately notes, enforcement of the plain terms of Section 9.3 could, as we believe happened here, result in the extinguishment of indemnification claims arising from the bonds and letter of credit before the Bond Covenant Termination Date.

To adopt the Court of Chancery's words, this construction might be seen as "undermin[ing] the purpose of the indemnification provisions,"[43] but such a fear overlooks the fact that indemnification is not the only remedy available under the Agreement. Instead, Section 9.7's preservation of equitable subrogation claims with respect to the bonds and letter of credit after the Termination Date fills the apparent void.[44] Thus, under our construction, the Plaintiffs would not be left without a remedy for bond losses incurred after the Termination Date. Indeed, NASDI Holdings brought such a claim *in this case* to recover their letter-of-credit loss.[45]

---

[43] *NASDI Holdings*, 2019 WL 1515153, at *5.

[44] As discussed above, Section 9.7 stipulates that the indemnification rights set forth in Article 9 shall be the parties' sole and exclusive remedies, but also states that, "[n]otwithstanding the foregoing, nothing in this Agreement shall limit (i) any Person's liability for such Person's common law fraud or (ii) any rights of subrogation the Parent or any Subsidiary of the Parent may have under or with respect to any Company Surety Bonds, any Company Surety Bond Obligations, the Parent Bond Guarantees, any Company LC Obligations or the Letter of Credit." App. to Opening Br. at A299–300.

[45] *Id.* at A35 ("**SECOND CAUSE OF ACTION[:]** *Equitable Subrogation*").

Finally, although our lodestar is the text and structure of the Agreement, our construction also respects the apparent purpose of the contract at issue. More particularly, it is not unreasonable to assume that the parties intended to impose indemnification obligations for losses relating to the bonds and letter of credit subject to a termination date approximately two years after the execution of the Agreement, especially when the remedy of equitable subrogation was explicitly carved out from any timing or notice limitations.

Other than to conclude that "[n]othing in Section 9.7 suggests that subrogation was to be the Plaintiffs' sole remedy for a claim based on a surety bond after the Termination Date,"[46] the majority does not address our construction of the Agreement, which harmonizes the plain text of Section 9.3 with the related provisions governing indemnification, bonding, and equitable subrogation.[47] Instead, the majority sacrifices the plain meaning of Section 9.3 on the altar of the "context of the provision and the contract as a whole" and concludes that it has found "the only reasonable and convincing interpretation of Section 9.3[.]"[48] We

---

[46] Maj. Op. at 16 n.18.

[47] The Defendants proffered this interpretation in the Court of Chancery and in this Court. App. to Opening Br. at A486–487 ("The Purchase Agreement expressly considers and bars claims for indemnification on the bond obligations made after March 31, 2016, but allows equitable claims on those specific obligations."); Opening Br. at 27 ("[T]he parties expressly allowed plaintiffs to make claims of equitable subrogation for any bond losses incurred after the Termination Date. In fact, the exception for claims of equitable subrogation is unnecessary if indemnification claims could be made indefinitely.").

[48] Maj. Op. at 14–15.

respectfully disagree. For our part, we think that harmonizing the Agreement's remedial provisions, as we have endeavored to do here, yields a more reasonable interpretation than simply disregarding the provisions deemed inconsistent with the contract's "context." And, if we in the dissent have not established our reading as the only acceptable one, we have at least identified a reasonable interpretation that conflicts with the Court of Chancery's and the majority's. That being so, the relevant provisions of the Agreement are ambiguous and the entry of summary judgment in favor of the Plaintiffs was erroneous.[49] Hence, we would remand for the consideration of extrinsic evidence.

---

[49] *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d at 56–57 ("When a contract's plain meaning, in the context of the overall structure of the contract, is susceptible to more than one reasonable interpretation, courts may consider extrinsic evidence to resolve the ambiguity." (internal quotation marks omitted)).