# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

SHEQUITA TRUITT,

Individually and as Administrator of
the Estate of G.M.T., a Minor,

Plaintiffs,

v.

BRYAN WINDER and
DWAYNE R. MCCONNELL,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. S20C-03-039 CAK

Submitted: November 5, 2025
Decided: December 4, 2025

*Defendants' Motion for Judgment as a Matter of Law under Superior Court Civil Rule 50 or, in the alternative, for a New Trial under Superior Court Civil Rule 59*

**GRANTED IN PART, DENIED IN PART**

**<u>MEMORANDUM OPINION AND ORDER</u>**

Gilbert F. Shelsby, Jr., Esquire, and James J. Meehan, III, Esquire, Shelsby & Leoni, 221 Main Street, Wilmington, DE 19804, Attorneys for Plaintiffs Shequita Truitt and the Estate of G.M.T.

Jeffrey A. Young, Esquire, Young & McNelis, 300 South State Street, Dover, DE 19901, Attorney for Defendant Bryan Winder.

Daniel P. Bennett, Esquire, Mintzer Sarawitz Zeris & Willis LLC, Citizens Bank Center, 919 North Market Street, Suite 200, Wilmington, DE 19801, Attorney for Defendant Dwayne R. McConnell.

**KARSNITZ, R. J.**

## PROCEDURAL BACKGROUND

This case originated as two wrongful death cases, one brought by Shequita Truitt, both individually and as the administrator of the estate of G.M.T., a minor ("Truitt" or "Plaintiffs") in New Castle County Superior Court on February 14, 2020, as amended on March 24, 2020, and the other brought by Jeremie Handy ("Handy") on March 27, 2020 in Sussex County Superior Court against, *inter alia*, Dwayne R. McConnell ("McConnell" or "Defendant McConnell") and Bryan Winder ("Winder" or "Defendant Winder") (McConnell and Winder, collectively, "Defendants"). The cases were consolidated for purposes of trial[1] in Sussex County Superior Court on December 15, 2022. Following discovery and pretrial motions, trial was held on March 17, 18, 19, and 20, 2025.

On Monday morning, March 17, 2025, the first day of trial, I severed Handy's claim. Neither Handy nor his counsel participated in the ensuing jury trial.

On Friday, March 21, 2025, the jury returned a verdict against McConnell and Winder,[2] found that that G.M.T. was not negligent, apportioned

---

[1] *See* 10 *Del. C*. § 3724(e).
[2] McConnel had stipulated as to his liability.

3

negligence between McConnell (90%) and Winder (10%), awarded $350,000.00 to the estate of G.M.T. for conscious pain and suffering and $68,069.44 for medical bills, and awarded $1,300,000.00 to Truitt for mental anguish.

On March 28, 2025, Plaintiffs filed a Motion for Pre- and Post-Judgment Interest and on April 1, 2025, Plaintiffs filed a Motion for Costs. On April 10, 2025, Winder filed Responses to both Motions, in which McConnell joined.

On April 3, 2025, Winder filed a Motion for Judgment as a Matter of Law[3] or, in the Alternative, for a New Trial,[4] in which McConnell joined. On April 23, 2025, Winder filed his Opening Brief in Support of his Motion, in which McConnell joined. On May 15, 2025, Plaintiffs filed their Opposition to this Motion. On May 28, 2025, Winder and McConnell filed their Reply. On July 24, 2025, I held oral argument on the Motion, requested partial transcripts of the trial related to some of the issues raised, allowed the parties to file supplemental pleadings, and scheduled another oral argument for October 23, 2025.

On September 12, 2025, Winder submitted his Supplemental Argument,

---

[3] Super. Ct. Crim. R. 50.
[4] Super. Ct. Crim. R. 59.

4

in which McConnell joined. Plaintiffs filed their Supplemental Answer on September 26, 2025. Winder and McConnell filed their Supplemental Reply on October 9, 2025. I held a second oral argument on October 23, 2025.

On October 27, 2025, Plaintiff filed a letter on one issue (comparative negligence of G.M.T.) with the Court and Defendants filed a joint response on November 5, 2025.

This is my ruling on all issues related to Defendants' Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial.

FACTS

Truitt and Handy are the estranged parents of a young girl, G.M.T., tragically killed by a car driven by McConnell. Winder was Truitt's boyfriend who was caring for G.M.T. on the date of the accident. The parties presented several contested versions of what happened. Truitt testified that she informed Defendant Winder to never allow G.M.T. or her brother to cross German Road to retrieve the mail. G.M.T.'s brother testified that Defendant Winder directed him and his sister to get the mail. Defendant Winder disputed the testimony of Truitt and G.M.T.'s brother.

On April 12, 2018, 9-year-old G.M.T. entered German Road in Seaford, Delaware. She and her 7-year-old brother had been at the mailbox across the

5

street from the house where they were living with their mother, Plaintiff Truitt, and Defendant Winder. Defendant Winder was inside the home preparing a meal for family members who were gathered for a funeral (after the death of an uncle). There was testimony that, prior to crossing the street, the children had been told it was clear to go to the mailbox by Glen Trammell, a friend of Defendant Winder, who provided transportation for the children to and from school daily. Additionally, just prior to their entering the roadway, George Winder, a cousin of Winder, yelled at the children to get back due to on-coming traffic. G.M.T. had been warned by her mother about the dangers of the roadway and had been told never to cross the street without an adult. G.M.T. was a bright, capable, physically fit girl.

Testimony varied regarding the 10 to 15 minutes prior to G.M.T. running into the road. Defendant Winder and his Aunt Virginia Hayes ("Hayes") testified that, during that time, the children were in the large front yard playing with their dog. G.M.T.'s 7-year-old younger brother testified that Defendant Winder had asked the children to get the mail. Hayes denied any such interaction during the approximately 15 minutes she had been in the home with Defendant Winder.

Defendant McConnell, the driver of the car that struck and killed G.M.T., stipulated and conceded that he was inattentive and a proximate cause of the collision and the death of G.M.T.

Following that collision, the testimony from those who tended to G.M.T. at the scene, as confirmed by the investigating officer, was that there was no responsiveness or sign of consciousness by G.M.T. She was ultimately pronounced dead due to internal decapitation. The pretrial deposition from Plaintiffs' medical expert, Dr. Dogali, stated that, in the immediate few minutes after the accident, it is <u>likely</u> that G.M.T. was partially aware and in intense pain, and that this period lasted less than 15 minutes. At trial, however, the doctor testified that G.M.T. likely suffered conscious pain and suffering for an hour after the collision, which concluded by the time she arrived at the hospital.

After the collision, Defendant McConnell fled the scene. Defendant Winder's family members attended to G.M.T. before paramedics arrived and she was ultimately taken via helicopter to AI DuPont Children's Hospital. She died two days later, on April 14, 2018. Evidence of the treatment provided at the hospital, as well as the medical bills incurred, was offered to the jury.

ARGUMENTS OF PARTIES

**Duty of Defendant Winder**

The issue of Defendant Winder's duty was addressed both in pretrial briefs, at trial, and again after trial. He argues that, under Rule 50, as a matter of law, his actions breached no duty owed to G.M.T. Winder cites to this Court:

> To maintain an action for negligence, the plaintiff must establish that the defendant was subject to "a duty to protect the plaintiff from the risk of harm that caused the injury." Whether or not a duty arises *on the facts of a particular case* is a question of law.[5]

In *Wilson*, the babysitter, who had been invited to a social host's pool party, was the responsible party for supervising the child who ultimately drowned. The pool-owning family as social hosts had no duty to supervise the child, as the babysitter was the one responsible for his care and supervision.

Here, argues Winder, even if he were the children's parent (which he is not) there was no evidence that G.M.T. was incapable of appreciating the potential dangers and risks of crossing the road. Accordingly, his decision to trust G.M.T. to stay within the boundaries of the large front yard, and not to

---

[5] *Wilson v. Urquhart*, 2010 WL 2683031, (Del. Super. 2010) at *3 (internal citation omitted; emphasis added).

cross the road without adult permission, did not breach any duty of supervision. G.M.T. was not "helpless to adequately aid or protect [her]self."[6] Likewise, there was no *misfeasance* by Defendant Winder. Any alleged inaction by Defendant Winder would constitute *nonfeasance* at worst, which provides a unique standard of care and duty and likewise eliminates any duty owed by Defendant Winder.[7] Even if Defendant Winder is deemed more than a social host on the facts of this case, there is no Delaware law that makes him the guarantor of G.M.T.'s safety. Defendant Winder was not required to hold G.M.T.'s hand at every moment of the day. Living near a country road does not create a new duty of hypervigilance any more than it requires such a property owner to build a wall or fence at the end of his yard. Consequently, in this case there was no duty, and therefore *a fortiori* there could be no breach thereof.

Plaintiffs counter that Defendant Winder misapplies the holding of *Wilson*, effectively arguing that he was no more than a social host as opposed to a babysitter, thereby absolving him of any duty or liability. Defendant Winder is akin to the babysitter in *Wilson*, not the social host, because he

---

[6] Restatement 2d. Torts § 324.
[7] See *Wilson, supra.*

9

undertook the duty to care for and supervise G.M.T. while her mother was at work, and he was required to use reasonable care to protect her from harm.

Plaintiffs also cite the Restatement of Torts:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.[8]

The Delaware Supreme Court has recognized that this section of the Restatement "addresses the duty owed by one who assumes direct responsibility for the safety of another through the rendering of services in the area of protection."[9]

Truitt testified at trial that Defendant Winder had agreed not to let G.M.T. cross the road to retrieve the mail without an adult. One disputed fact at trial was whether Defendant Winder told the children to go get the mail from the mailbox across the street, in contradiction of Truitt's instructions. G.M.T.'s brother testified that Winder so stated. Defendant Winder undertook a duty for

---

[8] Restatement 2d. Torts § 323.
[9] *Furek v. Univ. of Delaware*, 594 A.2d 506, 520 (Del. 1991).

the care and supervision of the children, including G.M.T., while Truitt was at work and was tasked with watching the children on the day in question. Plaintiffs argue that Defendant Winder's failure to fulfill this duty not only increased the risk of harm but also directly resulted in the harm that occurred.

**Proximate Cause**

Defendant Winder next argues that, even if he had a duty, or breached that duty, as a matter of law there is no causal connection between his action, or inaction, and the death of G.M.T. Essentially Winder argues that there are two independent intervening causes that broke the chain of causation: G.M.T.'s comparative negligence in darting into the road (see discussion below) and the stipulated negligence of the driver, McConnell. Winder could neither have anticipated nor reasonably prevented either of these intervening causes. Moreover, there was evidence at trial that when G.M.T. and her brother reached the edge of the road, Glen Trammell told them that it was safe to cross, but that when the children reentered the road, George Winder, a cousin of Defendant Winder, yelled at the children to get back. Winder argues that whatever legal duty he had to supervise G.M.T., no reasonable supervision would have prevented G.M.T.'s death. His failing to keep an eye on G.M.T. was not the cause of her death.

Plaintiffs counter with the trial testimony discussed above of G.M.T.'s brother, who testified that Defendant Winder told them to go get the mail, and Truitt's testimony that she told Defendant Winder to not let her children check the mailbox by themselves. Regardless of the testimony of Glen Trammell or George Winder, it was Defendant Winder's decision to instruct the two children to go and check the mail that was the proximate cause of G.M.T.'s being in the road and led to her death.

Defendant posits two superseding or intervening events breaking the causal chain: G.M.T.'s comparative negligence (see discussion below) and McConnell's negligence. Plaintiffs respond that, even if G.M.T. were negligent, it cannot be considered a superseding or intervening cause, since it is foreseeable that a child will not use the same level of judgment as an adult. Moreover, McConnell's conduct was not merely foreseeable, it was precisely the type of foreseeable risk that prompts adults to prevent small children from crossing a busy road unsupervised. Defendant Winder's negligence exposed G.M.T. to a foreseeable risk of harm from McConnell's conduct. In other words, McConnell's negligence cannot possibly be a superseding or intervening cause, because it was Winder's own negligence that created the risk that was realized through McConnell's negligence.

12

**Comparative Negligence**

As a threshold matter, Plaintiffs argue that, under Superior Court Civil Rule 50(b), Defendant is barred from raising the issue of G.M.T.'s comparative negligence on a Motion for Judgment as a Matter of Law because he failed to move for a directed verdict on the issue. This would run afoul of constitutional constraints because allowing trial courts to set aside jury verdicts on grounds not presented in pre-verdict motions could be viewed as an impermissible re-examination of jury verdicts in violation of the Seventh Amendment.[10]

Defendants counter that Rule 50(b) specifically states that a Motion for a New Trial may be made under Rule 59 as an alternative to a Motion for Judgment as a Matter of Law, even without pursuing a pre-verdict motion. In those instances, "the Court weighs the evidence in order to determine if the verdict is one which a reasonable prudent jury would have reached."[11] Defendants argue that under Rule 59 a reasonably prudent jury could not have reached the conclusion that G.M.T. was not negligent based upon the evidence presented to the Court. That decision is within the province of the trial court.

---

[10] *Dickens v. Costello*, 2004 WL 1731143, at *2 (Del. Super. Ct. July 20, 2004).
[11] *Id*.

Defendant Winder does not dispute that, as a general proposition, the comparative negligence of G.M.T. is a jury determination. However, he argues that, under certain circumstances, negligence can be determined as a matter of law under Rule 50, and, in this case, it was an error of law for the jury to have not found G.M.T. negligent to some degree. Defendant Winder, rather than asserting that G.M.T. was a helpless child, instead asserts that she was not helpless and required no special supervision. He had every reason to believe that G.M.T. would never enter the roadway without looking both ways, without checking for oncoming cars, or without seeking adult assistance if needed.

Defendant Winder argues that the fact that the jury attributed no negligence to G.M.T., where the evidence shows that she darted out in front of a motor vehicle, indicates not only the jury's failure to render a verdict consistent with the facts and the law, but rather that the jury determination was a result of passion and prejudice as opposed to a rational weighing of the evidence under Rule 59. As such, that aspect of the jury verdict alone warrants a new trial on all elements of negligence. It is not possible to retry the case on the sole issue of G.M.T.'s comparative negligence.

Plaintiffs counter that, as a practical matter, if another jury were impaneled to consider G.M.T.'s comparative negligence, the new jury could reasonably conclude – like the first jury -- that her comparative negligence was zero percent. The jury was properly instructed, without objection, that G.M.T.'s actions should be judged considering her age and experience, which accurately states the law and guidance to the jury on how a child's conduct should be judged. To acknowledge that a hypothetical second jury might well assign no more fault to G.M.T. than did the first recognizes that any reasonable jury might assign no fault to G.M.T. Therefore, the verdict on comparative negligence should not be disturbed.

Defendants argue that Plaintiffs' concerns about the practical impact of a second trial are unfounded. If the Court grants a Motion for New Trial, and a new trial is held, the Court will be given the opportunity to determine, based upon the evidence presented at the second trial, whether G.M.T. was negligent as a matter of law, thereby taking that decision away from the jury, as it has a right to do. In doing so, negligence would then be conceded on the part of Defendant McConnell, the Court would have found negligence on the part of G.M.T., and the remaining issues for the jury would be a decision on the

negligence of Defendant Winder, as well as the apportionment of fault between the parties.

**Conscious Pain and Suffering**

Defendants argue that the jury award of $350,000.00 to the Estate of G.M.T. for pain and suffering is not supported by the permissible evidence in the case. The testimony from the witnesses at the scene of this incident showed, without exception, the unresponsiveness of G.M.T. following being struck by a motor vehicle at 45 miles per hour. No one disputed the fact that she suffered an internal decapitation as a result. All the medical evidence in the case confirmed that the Glasgow Coma Score for G.M.T. was the lowest possible figure throughout. The only evidence supporting any conscious pain and suffering by G.M.T. was offered by the Plaintiffs' expert, Dr. Dogali. Dr. Dogali's only published and disclosed opinion, until he took the stand at trial, was that "in the immediate few minutes after the accident, it is likely that the patient was partially aware and in intense pain. It is likely that this period lasted less than 15 minutes." Based on that opinion by Dr. Dogali, even assuming the jury accepted it, the evidence of conscious pain and suffering for the decedent was quite limited. However, at trial Dr. Dogali opined that there may have

16

been conscious pain and suffering for up to <u>an hour</u> after the collision. Defendants' counsel moved to strike this testimony at trial and stated that he had been "sandbagged" by Plaintiffs, since he had relied on the expert's previous opinion provided in discovery. The motion was denied. Further, although Dr. Dogali conceded that the conscious pain and suffering element of the case ended when G.M.T. reached the hospital, the jurors were permitted to consider medical records from the hospital and medical bills related to the treatment for the decedent after the one-hour mark. That evidence led to comments by Plaintiffs' counsel emphasizing that G.M.T.'s death did not occur for several days, which suggested the claim by G.M.T.'s estate could consist of days of conscious pain and suffering. These arguments and inferences focused the jury on medical care and evidence having no bearing on the conscious pain and suffering claim.

Defendants argue that the issue is not whether the accident instantaneously killed G.M.T., but whether her estate has a viable claim for conscious pain and suffering. Repeatedly, Plaintiffs' counsel and Dr. Dogali focused on the fact that during intubation at the scene of the accident G.M.T. apparently bit down on the medical tube and Plaintiffs' counsel stated in his closing argument that "dead people don't bite." But whether G.M.T. was "alive"

in that first hour following the accident is entirely irrelevant. Rather, Plaintiffs must prove *conscious* pain and suffering by G.M.T. Instead, through some anecdotal analogies and hypothetical questions about pain, Dr. Dogali suggested that G.M.T. was feeling pain. Conjecture does not meet the required standard.[12] Similarly, Dr. Dogali's testimony about G.M.T.'s orthopedic injuries is irrelevant to the issue of whether she <u>consciously</u> <u>felt</u> any pain from those injuries during her state of shock. There is no such evidence.

The continued focus by Dr. Dogali on cerebral function, argue Defendants, does not address the issue of conscious pain and suffering. He ultimately conceded that he could not tell the jury definitively what G.M.T. experienced. Such speculative comments do not meet the reasonable degree of medical probability standard or the *Daubert* standard and simply underscore Dr. Dogali's theoretical comments about pain without actual evidence of consciousness.

Plaintiffs counter that the jury heard further testimony that G.M.T. was biting the breathing tube when she was intubated, which is consistent with a

---

[12] *Jones v. AstraZeneca*, 2010 WL 1267114 at \*9 ("An expert's impressive qualifications alone will not serve as a license to express *ipse dixit* rather than properly supported expert opinion.")

level of consciousness allowing the injured person to feel pain. Plaintiffs argue that Dr. Dogali's trial opinion was consistent with his disclosed expert report, which stated that G.M.T. likely experienced intense pain for up to 15 minutes. His testimony at trial, suggesting the possibility of a longer window, was not a deviation so extreme as to be discounted, particularly where Defendants had an opportunity to cross-examine him. Additionally, Defendants did not call any expert witnesses to contradict the opinions of Dr. Dogali, instead relying on both their opportunity to cross-examine Dr. Dogali and their lay-witness to make their case that there was little-to-no conscious pain and suffering experienced by G.M.T. However, neither Defendants' counsel nor the lay witness is qualified as a medical expert, and the jury was free to decide whom to believe.

Plaintiffs stress that the jury was properly instructed to consider only conscious pain and suffering. There is no evidence that the jury ignored these instructions or awarded damages for medical treatment beyond that which was related to the collision. The catastrophic nature and extent of G.M.T.'s injuries coupled with the amount of time which she suffered from them warrants the jury's award.

**Vouching**

Defendants argue that, given the emotionally charged nature of the case, rather than using judicious discretion and temperance, counsel for Plaintiffs in their closing argument appealed to the jury's passion, prejudice and partiality, and that this conduct "militate[d] against the 'prudent, disinterested evaluation of the evidence' which 'our system demands of jurors.'"[13] Defendants cite the Supreme Court's statement that "[b]ecause we cannot state with confidence that the comments under review did not prejudice the jury's assessment of the claim,"[14] a new trial on all issues is required.

Defendants argue that thirteen (13) specific examples of Plaintiffs' counsel's closing argument, particularly during rebuttal where there was no opportunity for Defendants' counsel to respond, went well beyond the recitation of evidence and reasonable inferences permitted for consideration. Instead, Plaintiffs' counsel's closing argument violated the precepts for closing arguments as follows: (1) in his closing, Plaintiffs' counsel told the jurors he had spent seven years watching videos of G.M.T. and offered his own positive

---

[13] *Delaware Olds Inc. v. Dixon*, 367 A.2d 178, 179 (Del. 1996).
[14] *DeAngelis*, 628 A.2d at 81.

opinions of her, notwithstanding the fact that <u>no</u> such videos were presented into evidence; (2) Plaintiffs' counsel accused Defendants' counsel of slandering him and Plaintiffs without any support for such a claim; and, (3) Plaintiffs' counsel vouched for the credibility of his own witnesses, including Plaintiffs, and negatively commented on the credibility of defense witnesses, while vouching for his own professional credibility and reputation.

The result, claim Defendants, was a jury verdict finding no comparative negligence on the part of G.M.T., an award to G.M.T.'s estate of $350,000 for pain and suffering (see discussion below), and $1.3 million for mental anguish to Truitt (see discussion below), which Defendants claim are excessive and a result of Plaintiffs' counsel improperly appealing to the jury's passion and sympathy.

Defendants rely on *Powell v. AmGuard Insurance Company*,[15] in which the Superior Court outlined the applicable standards and provides the consequences of an improper closing argument leading to a jury verdict which "likely resulted from passion or prejudice caused by the [Plaintiff's] summation."[16] In *Powell*, the Court stated that it "cannot make the required

---

[15] 2020 WL 996734 (Del. Super. 2020).
[16] *Id.*, at *14.

finding that the issues of liability and damages were distinctly considered. Under these circumstances, they were inexorably intertwined and a new trial [was required]."[17] In *Powell*, the effect of Plaintiff's counsel's improper closing argument resulted in a verdict which was directly the product of passion or prejudice, resulting in the Court ordering a new trial as to both liability and damages.

Plaintiffs argue that, unlike *Powell*, they did not introduce new facts or inapplicable law or suggest facts outside the record that could materially affect the jury's evaluation of liability or damages. There are no examples where Defendants' counsel objected to Plaintiffs' counsel's closing argument, where the Court sustained an objection and refused to issue a curative instruction, or where Plaintiffs' counsel was sanctioned or reprimanded for the remarks made during closing argument.

Moreover, argue Plaintiffs, Defendants' failure to object to Plaintiffs' counsel's statements during closing argument constitutes a waiver:

> A party must timely object to improper statements made during closing argument in order to give the trial court the opportunity to correct any error. We recognize that, for strategy reasons, counsel may choose not to object to a misstatement made in an opponent's

---

[17] *Id.*

closing remarks, but the failure to object generally constitutes waiver of the right subsequently to raise the issue.[18]

Even had Defendants preserved their objections, Plaintiffs argue that they would not be well taken. By way of example, with respect to the argument that Plaintiffs' counsel vouched for Truitt's credibility, this was done in the context of Defendant Winder's testimony contradicting Truitt's testimony in various respects (e.g., that she never told him not to let her children go check the mailbox by themselves).

## STANDARDS OF REVIEW

Two separate standards apply to these Motions. First, a motion for judgment as a matter of law under Rule 50 is appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue."[19] The Court must view the findings in the light most favorable to the non-moving party and determine whether a reasonable jury could "justifiably find in favor of the non-moving party."[20]

---

[18] *Med. Ctr. of Delaware, Inc. v. Lougheed*, 661 A.2d 1055, 1060 (Del. 1995).
[19] Super. Ct. Civ. R. 50 (a)(1); see also *Brown v. Liberty Mut. Ins. Co.* 774 A.2d 232, 245 (Del. 2001).
[20] *Delaware Elec. Co-op. Inc. v. Pitts*, 633 A.2d 369,1993 WL 445474 at *1 (Del. 1993).

By contrast, when considering a motion for new trial under Rule 59, the court must "weigh the evidence in order to determine if the verdict is one which a reasonably prudent jury would have reached."[21] The motion should be granted "only if the jury's verdict is 'clearly the result of passion, prejudice, partiality, or corruption' or the evidence 'preponderates so heavily against the jury verdict that a reasonable jury could not have reached the result.'"[22] Plaintiff argues further that a standard of "enormous deference" applies to motions for a new trial and requires that the verdict not be disturbed. Traditionally, the court's power to grant a new trial has been exercised cautiously and with extreme deference to the findings of the jury.[23] The Delaware Supreme Court has instructed that a jury verdict should only be disturbed when the evidence preponderates so heavily against it that no reasonable jury could have reached that verdict:

> A trial judge is only permitted to set aside a jury verdict when in his judgment it is at least against the great weight of the evidence. In other words, barring exceptional circumstances, a trial judge should not set aside a jury verdict on such ground unless, on a review of all the evidence, the evidence preponderates so heavily

---

[21] *Burgos v. Hickok*, 695 A.2d 1141, 1144-45 (Del. 1997).
[22] *Lang v. Morant*, 867 A.2d 182, 185 (Del. 2005).
[23] *Connelly v. Kingsland*, 2012 WL 1408880, at *2 (Del. Super. Ct. Mar. 30, 2012).

against the jury verdict that a reasonable jury could not have reached the result."[24]

## ANALYSIS

Although they are not mutually exclusive,[25] the issues discussed above break down into roughly two categories: those that Defendants argue should be resolved as a matter of law under Rule 50, and those that Defendants argue require a new trial under Rule 59. The first category incudes, broadly speaking, the issues related to liability (duty, proximate cause, and comparative negligence) and the issue of conscious pain and suffering. The second category includes vouching by Plaintiffs' counsel during closing argument, which Defendants argue requires a new trial. I will consider the issues accordingly, with particular emphasis on Defendant Winder's duty, which was prominent among the issues briefed and argued before, during and after trial.

**Duty**

---

[24] *Storey v. Camper*, 401 A.2d 458, 465 (Del. 1979).

[25] Rule 50(b) provides in pertinent part: Whenever a motion for a judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, the Court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Such a motion may be renewed by service and filing not later than 10 days after entry of judgment. A motion for a new trial under Rule 59 may be joined with a renewal of the motion for judgment as a matter of law, or a new trial may be requested in the alternative. If a verdict was returned, the Court may, in disposing of the renewed motion, allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as a matter of law.

Plaintiffs have asserted claims of negligent conduct against Defendant Winder, through both nonfeasance (inadequate supervision) and misfeasance (telling G.M.T. to go get the mail). In the Motion, Defendant Winder asserts that he owed no duty to G.M.T. based solely upon his status as a person responsible for her supervision on the day of her death. To maintain an action for negligence, Plaintiffs must establish that Defendant Winder was subject to "a duty to protect [G.M.T.] from the risk of harm that caused the injury."[26] Whether or not a duty arises on the facts of a particular case is a question of law.[27]

As a necessary element of a negligence claim, the concept of duty provides a limitation on liability, requiring that Plaintiffs show that Defendant Winder had a "definite legal obligation" to G.M.T.[28] In determining the existence of a duty, I must decide whether such "a relationship exists between the parties that the community will impose a legal obligation upon one for the

---

[26] *Achtermann v. Bussard,* 2007 WL 901642, at *2 (Del. Super. Mar. 22, 2007)**,** *aff'd sub nom.* *Achtermann v. Warrington,* 957 A.2d 1 (Del.2008)**.**
[27] *Id.*
[28] *In re Asbestos Litig.,* 2007 WL 4571196 (Del. Super. Dec. 21, 2007)**,** *aff'd sub nom. Riedel v. ICI Ams. Inc.,* 968 A.2d 17 (Del.2009) **(**quoting *James v. Meow Media, Inc.,* 300 F.3d 683, 690 (6th Cir.2002)**).**

benefit of the other."[29] Such a relationship may be grounded in "contract, statute, municipal ordinance, administrative regulation, common law, or the interdependent nature of human society," or may have its genesis in "the particular facts and circumstances of the case."[30]

The law has struggled with articulating a rational and consistent basis for discerning when the relationship between parties imposes a duty of care on the defendant.[31] The Restatement (Second) of Torts offers several principles that guide my duty analysis.[32] The Restatement utilizes the term "duty" as a means "to denote the fact that the actor is required to conduct himself in a particular manner at the risk that if he does not do so he becomes subject to liability to another to whom the duty is owed for any injury sustained by such other, of which that actor's conduct is a legal cause."[33] The Restatement explains that the existence and scope of a defendant's duty may differ depending upon whether his conduct involves misfeasance or nonfeasance:

> In general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them

---

[29] *Naidu v. Laird,* 539 A.2d 1064, 1070 (Del.1988) (quoting W. Keeton et al., Prosser & Keeton on the Law of Torts § 37, at 236 (5th ed.1984)).

[30] 57A Am. Jur. 2d *Negligence* § 82 (2010); *see also In re Asbestos Litig.,* 2007 WL 4571196, at *4.

[31] *In re Asbestos Litig.,* 2007 WL 4571196, at *4–8.

[32] *Riedel,* 968 A.2d at 20.

[33] Restatement (Second) of Torts § 4.

against an unreasonable risk of harm to them arising out of the act. The duties of one who merely omits to act are more restricted, and in general are confined to situations where there is a special relation between the actor and the other which gives rise to the duty.... If the actor is under no duty to the other to act, his failure to do so may be negligent conduct ... but it does not subject him to liability, because of the absence of duty.[34]

Early common law imposed liability for the conduct of those who injured others by "positive affirmative" actions, while rarely imposing liability upon those "who merely did nothing, even though another might suffer serious harm" as a result of nonfeasance.[35] Thus, liability for the failure to act "appeared first in, and is still largely confined to, situations in which there was some special relation between the parties, on the basis of which the defendant was found to have a duty to take action for the aid or protection of the plaintiff."[36] Several sections of the Restatement describe the "special relations" and other circumstances that may subject a defendant to liability for nonfeasance.[37] Section 323 provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to

---

[34] *Id.* § 302 cmt. a.
[35] *Id.* § 314 cmt. c.
[36] *Id.*
[37] *Id.* §§ 314A, 315–324A. Section 324 addresses the liability of a person who takes charge of another person who is helpless, but the parties did not contend that G.M.T. was a helpless child.

the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.[38]

Our Supreme Court has recognized that Section 323 "addresses the duty owed by one who assumes direct responsibility for the safety of another through the rendering of services in the area of protection."[39]

There is no question that Defendant Winder had a duty to refrain from affirmative negligent conduct with respect to G.M.T. on the day of the accident. But Defendant Winder argues that it does not automatically follow that he was obligated to take extraordinary steps to supervise G.M.T. as the person responsible for her care. To me, this argument conflates the *existence* of a duty with the *scope* of that duty. As I pointed out during the oral arguments, there is no difference to me between the facts of this case and a situation where Defendant Winder had put G.M.T. in a car and proceeded to drive negligently, resulting is injury or death to G.M.T. A duty, albeit perhaps a different one, still exists.

---

[38] *Id.* § 323.
[39] *Furek v. Univ. of Delaware*, 594 A.2d 506, 520 (Del. 1991).

29

The obligation to supervise and care for a child is a profoundly important and weighty duty, and the loss of a child is tragic. There are situations in which the law imposes obligations upon adults for the care and supervision of the children around them. This case is one of them. I hold that, as matter of law, Defendant Winder had a duty to G.M.T.

Whether Defendant Winder breached that duty on the facts of this case is a matter for jury determination. Among other evidence, there was testimony that Truitt told Defendant Winder never to let the children cross the street to get the mail. There was also testimony that Winder asked the children to get the mail, as well as conflicting testimony that he did not do so. There was also evidence at trial that when G.M.T. and her brother reached the edge of the road, Glen Trammell told them that it was safe to cross, but that when the children reentered the road, George Winder, a cousin of Defendant Winder, yelled at the children to get back.

Under Rule 50, after a full trial on the issue, I must determine whether there is a legally sufficient evidentiary basis for a reasonable jury to find for Plaintiffs on the duty issue. Viewing the findings in the light most favorable to Plaintiffs, in my view a reasonable jury could justifiably find in favor of Plaintiffs on this issue. Whether I or anyone else might have reached a different conclusion is

30

irrelevant to this determination. In the alternative, under Rule 59, I must weigh the evidence to determine if the verdict is one which a reasonably prudent jury would have reached. In my view, it is.

Defendants' Motion is denied on the issue of duty.

**Proximate Cause**

Defendant Winder next argues that, as a matter of law, even if he had a duty, or breached that duty, there is no causal connection between his action, or inaction, and the death of G.M.T. Winder argues that there are two independent intervening causes that broke the chain of causation: G.M.T.'s comparative negligence in darting into the road (see analysis below), and the stipulated negligence of the driver, McConnell. Winder argues he could neither have anticipated nor reasonably prevented these two intervening events.

The jury was instructed, "Proximate cause is a cause that directly produces the harm, and but for which the harm would not have occurred." The Delaware Supreme Court has stated: "In order to satisfy the 'but for' test, a proximate cause must be one 'which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without

31

which the result would not have occurred.'" [40]

There was evidence at trial that when G.M.T. and her brother reached the edge of the road, Glen Trammell told them that it was safe to cross, but that when the children reentered the road, George Winder, a cousin of Defendant Winder, yelled at the children to get back. There is also the testimony of G.M.T.'s brother, who testified that Defendant Winder told them to go get the mail, and Truitt's testimony that she told Defendant Winder to not let her children check the mailbox by themselves.

Under Rule 50, after a full trial on the issue, I must determine whether there is a legally sufficient evidentiary basis for a reasonable jury to find for Plaintiffs on the proximate cause issue, i.e., whether Defendant Winder's conduct was a cause that directly produced the harm to G.M.T., and but for which that harm would not have occurred. Viewing the findings in the light most favorable to Plaintiffs, in my view a reasonable jury could justifiably find in favor of Plaintiffs on this issue. Whether I or anyone else might have reached a different

---

[40] *Moffitt v. Carroll*¸640 A.2d 169, 174 (Del. 1994); *Palsgraf v. Long Island Railroad Co.*, 162 N.E. 99 (N.Y. Ct. App. 1928).

conclusion is irrelevant to this determination. In the alternative, under Rule 59, I must weigh the evidence to determine if the verdict is one which a reasonably prudent jury would have reached. In my view, it is.

Defendants' Motion is denied on the issue of proximate cause.

**Comparative Negligence**

As a threshold matter, I hold that Defendant Winder is not barred from raising the issue of G.M.T.'s comparative negligence on a Motion for Judgment as a Matter of Law under Rule 50 because he failed to do so at trial. The cases affirm that a Motion for a New Trial may be made under Rule 59 as an alternative to a Motion for Judgment as a Matter of Law under Rule 50, even without pursuing a pre-verdict motion.[41]

Our Supreme Court has held that, for purposes of assessing comparative negligence, a young child's discernment is a case-specific question of fact for the jury:

> Courts have found it impossible to lay down a fixed and fast rule for determination in every case as to at what age and under what circumstances the child may be guilty of contributory negligence. The maturity and capacity of the child, her ability

---

[41] *Burgos v. Hickok*, 695 A.2d 1141 (Del. 1997); *Mumford v. Paris*, 2003 WL 231611 (Del. Super., Jan. 31, 2003).

to understand and appreciate the danger, her familiarity with the surroundings, together with the circumstances under which the accident occurred, must all be taken into consideration in determining whether or not she was guilty of contributory negligence.

***

No case in this State has been cited to us, and our own investigation has failed to disclose any case, where any court in this State has held a minor plaintiff of approximately the same age as the plaintiff in this case guilty of contributory negligence as a matter of law.

***

We think that under such circumstances it cannot be said plaintiff was guilty of contributory negligence as a matter of law but that it was a question of fact for the jury to determine."[42]

Just two years after *Pokoyski* was decided, the Supreme Court addressed the "age of discernment" issue, and followed *Pokoyski* in treating it as a question of fact for the jury:

 The Supreme Court of Delaware has already established that a minor may be guilty of contributory negligence.  It has further held that a question of this type hinges on the maturity and capacity of the child, the ability and understanding to appreciate the dangers

---

[42] *Pokoyski v. McDermott*, 167 A.2d 742, 743-45 (Del. 1961). *Pokoyski* involved the alleged comparative negligence of a 10½-year-old.

involved, as well as other pertinent circumstances. Thus, *the question of negligence is one for determination by a jury*.[43]

As recently as 2004, the Supreme Court quoted *Audet* for this same proposition:

> The question of minor Plaintiff's potential contributory negligence is a "question [that] hinges on the maturity and capacity of the child, the ability and understanding to appreciate the particular dangers involved, as well as other pertinent circumstances. Thus, the question of negligence is one for determination by a jury."[44]

In short, an unbroken line of authority leaves it to the jury to decide whether a particular child was capable of comparative negligence or was indeed comparatively negligent. This was the form jury instruction provided to the jury in this case and was not objected to by Defendants.

Although the comparative negligence of G.M.T. would normally be a jury determination, under certain circumstances comparative negligence can be determined under Rule 59 and, in such a case, "the Court weighs the evidence in order to determine if the verdict is one which a reasonable prudent jury would have reached."[45] That determination is also within the province of the trial court

---

[43] *Audet v. Convery*, 187 A.2d 412, 413 (Del. Super. Ct. 1963) (citing *Pokoyski*) (emphasis added).
[44] *McCormick v. Hoddinott*, 865 A.2d 523, 533 (Del. Super. Ct. 2004) (quoting *Audet* at 413).
[45] *Id*.

under Rule 59, and the trial court can be found to have abused its discretion in not granting a Motion for New Trial.[46] Defendant Winder argues that the fact that the jury attributed no negligence to G.M.T., where the evidence shows that she darted out in front of a motor vehicle, indicates not only the jury's failure to render a verdict consistent with the facts and the law under Rule 50, but also that the jury determination was a result of passion and prejudice as opposed to a rational weighing of the evidence, thereby requiring a new trial under Rule 59.

Defendant Winder relies on *Hudson v. Old Guard Ins. Co.*,[47] in which a 12-year-old child on his bicycle in the front yard of his home abutting a narrow country road suddenly veered out into the roadway and was struck by an oncoming motorist. At the close of the Plaintiff's case, the Superior Court granted the Defendant judgment as a matter of law, determining that the minor's actions exceeded the negligence of the motor vehicle operator as a matter of law. The Supreme Court affirmed that decision. Similarly, other Delaware cases involved similar "dart out" factual circumstances where not only was negligence determined against the "darter," but judgement as a matter of law in

---

[46] *Amalfitano v. Baker*, 794 A.2d 575 (Del. 2001).
[47] 3 A.3d 246 (Del. 2010).

favor of the Defendant was granted.[48] In *O'Neal*, where a pedestrian ran out in front of a motor vehicle, the Court stated, "Pedestrians are required to obey traffic control devices and shall not 'suddenly leave a curb or other place of safety and walk or run into the path of a vehicle which is so close as to constitute an immediate hazard.'"[49]

The evidence in this case, however, differs from *Hudson* in that there are many more factors for comparative negligence than McConnell's negligence and G.M.T.'s "darting." There is also evidence at trial that when G.M.T. and her brother reached the edge of the road, Glen Trammell told them that it was safe to cross, but that when the children reentered the road, George Winder, a cousin of Defendant Winder, yelled at the children to get back. There is also the testimony of G.M.T.'s brother, who testified that Defendant Winder told them to go get the mail, and Truitt's testimony that she told Defendant Winder to not let her children check the mailbox by themselves.

---

[48] *Trievel v. Sabo*, 714 A.2d 742 (Del. 1998); *O'Neal v. Allstate Ins. Co.*, 2023 WL 4704684 (Del. Super. 2023).
[49] *Id.* at *6.

Under Rule 50, after a full trial on the issue, I must determine whether there is a legally sufficient evidentiary basis for a reasonable jury to find for Plaintiffs on the comparative negligence issue. Viewing the findings in the light most favorable to Plaintiffs, in my view a reasonable jury could justifiably find in favor of Plaintiffs on this issue. The evidence was in conflict. G.M.T. was nine years old. A jury could have concluded that those at the scene gave G.M.T. conflicting instructions. The jury could well have concluded that Defendant Winder directed G.M.T. to a dangerous position. Whether I or anyone else might have reached a different conclusion is irrelevant to this determination. In the alternative, under Rule 59, I must weigh the evidence to determine if the verdict is one which a reasonably prudent jury would have reached. In my view, it is.

Defendants' Motion is denied on the issue of comparative negligence.

**Conscious Pain and Suffering**

Defendants ask me to determine whether as a matter of law under Rule 50 the jury award of $350,000 to the Estate of GM.T. for pain and suffering is supported by the permissible evidence in the case.

In order for the Estate of G.M.T to have a viable claim for pain and suffering, it must prove *conscious* pain and suffering. For better or worse, Delaware had no cause of action for unconscious pain and suffering. It is not enough to prove that G.M.T. was alive for a few days after the accident. Rather, the Estate must prove that there was "life plus": in addition to being alive, G.M.T. was sufficiently conscious to feel pain and endure physical suffering.

Delaware law allows recovery for conscious pain and suffering experienced between the time of injury and death. The plaintiff must demonstrate by a preponderance of the evidence that the decedent did not die instantaneously upon impact, and that there was an appreciable interval during which the decedent experienced conscious pain and suffering.[50] The Estate of G.M.T. bears the burden of proving the existence of conscious pain and suffering. Mere conclusory or self-serving allegations that the decedent lived and suffered are insufficient, particularly when the record supports a finding of almost instantaneous death. Pain and suffering that are substantially contemporaneous with death or occur during a short period of insensibility

---

[50] *Magee v. Rose*, 405 A.2d 143 (1979).

between fatal injuries and death do not meet the evidentiary threshold required for recovery.[51]

The evidence required to establish conscious pain and suffering may include expert medical testimony, eyewitness accounts, or other factual evidence demonstrating the decedent's awareness and ability to experience pain before death. In *Estate of Alberta Rae v. Murphy,*[52] the court denied summary judgment on the issue of conscious pain and suffering because both parties presented opposing expert opinions regarding whether the decedent remained conscious and suffered after the accident. The court held that the jury must resolve this factual dispute based on the evidence presented at trial. Similarly, in *Fall v. Evans*, the court stated that if evidence shows the decedent died instantaneously, did not regain consciousness before death, or experienced pain only substantially contemporaneous with death, the plaintiff has not sufficiently supported the claim for conscious pain and suffering.

Expert testimony plays a critical role in determining whether conscious pain and suffering occurred. Courts have allowed experts to opine on whether the decedent experienced conscious pain and suffering and the duration of such

---

[51] *Id.*; *Fall v. Evans*, 1989 WL 31558 (Del. Super. Mar. 28, 1989).
[52] 2006 WL 1067277 (Del. Super. Apr. 19, 2006).

suffering. For instance, in *Brown v. Fisher-Price, Inc.*,[53] the court noted that expert testimony on the decedent's awareness and ability to experience pain was relevant to determining damages for conscious pain and suffering.

The Estate of G.M.T. must prove by a preponderance of the evidence that the decedent experienced conscious pain and suffering during an appreciable interval after the injury. This standard ensures that recovery is based on demonstrable evidence rather than speculation or assumption. Courts have consistently held that the existence of conscious pain and suffering must be established through credible evidence, and the absence of such evidence may preclude recovery.[54]

As discussed above, there was testimony from the witnesses at the scene of the accident which showed, without exception, the unresponsiveness of G.M.T. following being struck by a motor vehicle at 45 mph. No one disputed the fact that she suffered an internal decapitation as a result. All the medical evidence in the case confirmed that her Glasgow Coma Score was the lowest possible figure throughout. The only evidence of conscious pain and suffering was offered by the Estate's expert witness, Dr. Dogali, so I look to his testimony

---

[53] 2024 WL 5199952 (Del. Super. Dec. 20, 2024).
[54] *Magee v. Rose*, supra.

41

to determine whether this was proved. As discussed fully above, Dr. Dogali offered a variety of anecdotal analogies and hypothetical questions about the experience of pain by severely injured persons and conjectured that G.M.T. could have indeed felt pain. However, conjecture is not enough.[55] Other than the testimony about G.M.T.'s biting on the intubation tube (which could have been a purely physiological reflex), the hypothetical or anecdotal testimony about select other patients who allegedly suffered trauma and survived, and the focus on G.M.T. being alive beyond the point where she was struck by the car, Dr. Dogali offers no competent testimony regarding any <u>conscious</u> pain and suffering. Similarly, Dr. Dogali's testimony about the pain level of the types of orthopedic injuries suffered by G.M.T. generally is irrelevant to the issue of the specific pain and suffering by G.M.T. Expert testimony must be weighed against much stricter standards.[56]

My role is not to speculate on the vagaries of death and dying, consciousness and unconsciousness, or the experience of pain by unconscious

---

[55] *Jones v. AstraZeneca*, 2010 WL 1267114 at *9 ("An expert's impressive qualifications alone will not serve as a license to express *ipse dixit* rather than properly supported expert opinion.")

[56] *In Re Zantac (Ranitidine) Litigation*, 342 A.3d 1131 (Del. 2025).

or dying persons who later regain consciousness or are restored to life. I leave that to the philosophers and theologians. My role is to determine whether under Rule 50, after a full trial on the issue, there is a legally sufficient evidentiary basis for a reasonable jury to find for Plaintiffs on the issue of conscious pain and suffering. Viewing the evidence in the light most favorable to Estate of G.M.T, in my view a reasonable jury could not justifiably find in favor of the Estate on this issue. In the alternative, under Rule 59, I must weigh the evidence to determine if the verdict on conscious pain and suffering is one which a reasonably prudent jury would have reached. In my view, it is not.

Defendants' Motion is granted on the issue of conscious pain and suffering.

I also considered whether the injection of this issue at trial inappropriately influenced the entire verdict. I believe it did not. The other parts of the verdict addressed losses to Truitt because of the death of her child. Defendants did not dispute the testimony of Truitt as she described her daughter and their relationship. The loss is incalculable, but we require the jury to calculate the loss. Whether or not a limited period of pain and suffering affected the rest of the verdict is impossible to tell. For me, the loss to Truitt more likely

influenced the assessment of loss because of putative conscious pain and suffering, and the rest of the verdict constitutes a legitimate assessment of the evidence.

**Vouching**

Defendants ask me to order a new trial under Rule 59 because of impermissible vouching by Plaintiffs' counsel during their closing argument. Defendants cite thirteen (13) specific statement by Plaintiffs' counsel which Defendants argue appealed to the jury's passion, prejudice and partiality, and that this conduct "militate[d] against the 'prudent, disinterested evaluation of the evidence' which 'our system demands of jurors.'"[57] Defendants cite our Supreme Court's statement that "[b]ecause we cannot state with confidence that the comments under review did not prejudice the jury's assessment of the claim,"[58] a new trial is required.

Delaware Rule of Professional Conduct 3.4(e) states "a lawyer shall not, in trial … assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility

---

[57] *Delaware Olds Inc. v. Dixon*, 367 A.2d 178, 179 (Del. 1996).
[58] *DeAngelis v. Harrison*, 628 A.2d 77, 81 (Del.1993).

of a witness, [or] the culpability of a civil litigant." The Delaware Supreme

Court has stated:

> Although recognizing that counsel are permitted a certain flexibility in presenting zealous jury argument, this Court has placed limits on such advocacy. We have ruled that it is improper for counsel to make a factual statement which is not supported by the evidence; to comment on the legitimacy of a client's claim or defense; to mention that the Defendant is insured; to suggest to the jury that it place themselves in the Plaintiff's position; to comment on a witness's credibility based on personal knowledge or evidence not in the record; to vouch for a client's credibility; or to make an erroneous statement of law."[59]

As a threshold procedural matter, Plaintiffs argue that Defendants' failure

to object to Plaintiffs' counsel's statements during closing argument constitutes

a waiver:

> A party must timely object to improper statements made during closing argument in order to give the trial court the opportunity to correct any error. We recognize that, for strategy reasons, counsel may choose not to object to a misstatement made in an opponent's closing remarks, but the failure to object generally constitutes waiver of the right subsequently to raise the issue.[60]

---

[59] *Id.* at 80.
[60] *Med. Ctr. of Delaware, Inc. v. Lougheed*, 661 A.2d 1055, 1060 (Del. 1995).

At oral argument on July 24, 2025, Defendants' counsel stated that there is an exception to this rule if the statements made amount to "plain error." However, counter Plaintiffs' counsel, "plain error" is an appellate standard and not one for the trial court's analysis in deciding motions for new trial.[61] In *Powell*, the Court stated:

> At the outset, AmGuard incorrectly charges this Court with plain error. Plain error is an appellate standard and has no place in a trial court's analysis. Nevertheless, the Court understands that AmGuard seeks to impose a post-facto burden upon the Court to have intervened *sua sponte*. This disregards that experienced attorneys, such as trial counsel in this case, often choose not to object for tactical reasons. Such reasons often include a decision to permit opposing counsel to overreach, which can impair an opponent's credibility with the jury. In fact, counsel for AmGuard took that approach. Much of AmGuard's closing argument focused on the lack of evidentiary support for opposing counsel's arguments and that he overreached by grossly exaggerating the Estate's claims. In hindsight, with this particular jury, the approach did not benefit AmGuard. Regardless, it was not the Court's responsibility to make a real time decision to intervene and countermand AmGuard's tactical decision to not object.[62]

In *Powell*, the Superior Court outlined the applicable standards and the consequences of an improper closing argument leading to a jury verdict which

---

[61] *Powell v. AmGuard Ins. Co.*, 2020 WL 996734 (Del. Super. Ct. Mar. 2, 2020).
[62] *Id*. at *7.

"likely resulted from passion or prejudice caused by the [Plaintiff's] summation."[63] The Court stated that it "cannot make the required finding that the issues of liability and damages were distinctly considered. Under these circumstances, they were inexorably intertwined and a new trial [was required]."[64] In *Powell*, the effect of Plaintiff's counsel's improper closing argument resulted in a verdict which was directly the product of passion or prejudice, resulting in the Court ordering a new trial as to both liability and damages.

I need not rule on whether Defendants waived their objection to vouching by failing to object during closing argument, or whether Plaintiffs' counsel's statements can or should be addressed under the "plain error" standard by me as a trial judge, or, if so, whether they constitute "plain error." That is because whether I treat those statements under the high "plain error standard" or some other standard, they do not meet the requirements for a new trial under Rule 59:

> A new trial is warranted only if the jury's verdict is clearly the result of passion, prejudice, partiality, corruption, or confusion, or the evidence preponderates so heavily against the jury verdict that a reasonable jury could not have reached the result.[65]

---

[63] *Id.*, at *14.
[64] *Id.*
[65] *Reinco, Inc. v. Thompson*, 906 A.2d 103, 110–11 (Del. 2006).

Under Delaware law, "enormous deference is given to jury verdicts,"[66] and the burden lies with the moving party to demonstrate that no reasonable jury could have arrived at the verdict rendered.

The Delaware Supreme Court has summarized the standard as follows:

[A] trial judge is only permitted to set aside a jury verdict when in his judgment it is at least against the great weight of the evidence. In other words, barring exceptional circumstances, a trial judge should not set aside a jury verdict on such ground unless, on a review of all the evidence, the evidence preponderates so heavily against the jury verdict that a reasonable jury could not have reached the result."[67]

In my view, however close to the line Plaintiffs' counsel's thirteen statements may have come, they did not cross over the line under this standard. Plaintiffs' counsel should be given considerable leeway for zealous advocacy. The statements did not so inflame the passions, prejudices, or partiality of the jury, or so corrupt or confuse the jury, that the verdict is irretrievably tainted and cannot stand.

---

[66] *Young v. Frase*, 702 A.2d 1234, 1236 (Del. 1997).
[67] *Storey v. Camper*, 401 A.2d 458, 465 (Del. 1979).

Defendants' Motion is denied on the issue of vouching during closing argument.

**Damages**

Although the parties did not extensively address the *amount* of damages in their papers and oral arguments, I find that the amount of the medical bills awarded to the Estate of G.M.T. ($68,069.44) was reasonable. I have set aside the $350,000.00 award to the Estate of G.M.T. for conscious pain and suffering. I also uphold the award of $1,300,000.00 to Truitt for mental anguish. Although the value of a person's life, particularly the life of a young child, is not capable of precise calculation, this verdict does not shock the conscience of the Court. "[I]n the absence of exceptional circumstances, the validity of damages determined by the jury should be presumed."[68]

## CONCLUSION

For the reasons discussed above, Defendants' Motion for Judgment as a Matter of Law or, in the alternative, for a New Trial is **GRANTED** with respect

---

[68] *Connelly v. Kingsland*, 2012 WL 1408880, at *2 (Del. Super. Ct. Mar. 30, 2012).

to the jury's award of $350,000.00 to the Estate of G.M.T. for pain and suffering, which is vacated. In all other respects the Motion is **DENIED**.

   **IT IS SO ORDERED**.

                                        /s/ Craig A. Karsnitz
                                        Craig A. Karsnitz

cc:    Prothonotary